# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

# CENTRAL DIVISION

| | |
|---|---|
| DEBRA JONES and ARDEN C. POST, individually and as the natural parents of Todd R. Murray; and DEBRA JONES, as personal representative of the Estate of Todd R. Murray, for and on behalf of the heirs of Todd. R. Murray,<br><br>Plaintiffs,<br><br>vs.<br><br>VANCE NORTON, Vernal City police officer in his official and individual capacity; et al.,<br><br>Defendants. | **ORDER**<br><br>**AND**<br><br>**MEMORANDUM DECISION**<br><br>Case No. 2:09-CV-730-TC |

Plaintiffs have moved for default judgment on claims 1, 3, 5, 7, 9, 10, 11 and 12 of the Third Amended Complaint contending that Defendants intentionally mishandled, destroyed and lost critical evidence. Alternatively, if default judgment is not entered, Plaintiffs seek lesser sanctions including exclusion of certain items of evidence, an award of fines, and attorney fees and costs. On June 6, 2013, the court held an evidentiary hearing on Plaintiffs' motion.

Because the court finds that none of the named Defendants had a duty to preserve the evidence Plaintiffs claim was intentionally destroyed or mishandled, Plaintiffs' motion for default judgment (Docket No. 258) against all Defendants is DENIED. The court also finds that lesser spoliation sanctions are not appropriate and will not be imposed on Defendants Vance Norton, Dave Swenson, Craig Young, Rex Olsen, Jeff Chugg, Anthoney Byron, Bevan Watkins, Troy Slaugh, Sean Davis, and Uintah County. Plaintiffs' motion for lesser spoliation sanctions

(Docket No. 258) against these Defendants is also DENIED.

Plaintiffs' motion for lesser spoliation sanctions against Defendant Vernal City is taken under advisement. Plaintiffs may file a supplemental memorandum within three weeks of the date of this order explaining why Vernal City should be found liable for spoliation sanctions for the failure to test Mr. Murray's firearm before its destruction, the failure to test Detective Norton's firearm, and the failure to swab and test Detective Norton's hands and clothing. Defendant Vernal City may file an opposition brief three weeks after having received Plaintiffs' memorandum. Plaintiffs' reply, if any, is due ten days after receiving Vernal City's opposition.

## I. FACTUAL BACKGROUND

This order is one of two orders issued by the court in this case today. In the order on multiple cross motions for summary judgment, the court has provided a full factual background of this case. The court will include other facts necessary to explain the court's decision in this order.

## II. ANALYSIS

Spoliation sanctions are appropriate when "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." Turner v. Pub. Serv. Co. of Colo., 563 F.3d 1136, 1149 (10th Cir. 2009) (quoting Burlington N. & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1032 (10th Cir. 2007)). If spoliation has occurred, a court may impose a variety of sanctions including dismissal, judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorney's fees and costs. Goodman v. Praxair Servs., Inc., 632 F. Supp. 2d 494, 506 (D. Md. 2009) (citing In re NTL, Inc. Secs. Litig., 244 F.R.D. 179, 191

(S.D.N.Y. 2007)).

In deciding whether the court should order dismissal or default, it also considers other factors, including: (1) the degree of actual prejudice to the party seeking sanctions; (2) the amount of interference with the judicial process; (3) the culpability of the litigant, (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance, and (5) the efficacy of lesser sanctions. Ehrenhaus v. Reynolds, 965 F.2d 916, 921 (10th Cir. 1992) (internal citations omitted). These factors do not constitute a rigid test, "rather, they represent criteria for the district court to consider prior to imposing dismissal as a sanction." Id.

A dismissal or entry of default order should be predicated on "'willfulness, bad faith, or [some] fault.'" Lee v. Max Int'l, LLC, 638 F.3d 1318, 1321 (10th Cir. 2011) (quoting Archibeque v. Atchinson, Topeka & Santa Fe Ry., 70 F.3d 1172, 1174 (10th Cir. 1995)). Mere negligence in destroying or losing records "is not enough because it does not support an inference of consciousness of a weak case." Turner, 563 F.3d at 1149 (quoting Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997)). Without a showing of bad faith, a court may only consider imposing lesser sanctions. Id. (citing Henning v. Union Pac. R.R. Co., 530 F.3d 1206, 1220 (10th Cir. 2008)).

Plaintiffs recite a long list of acts and failures to act that they contend "irreparably impaired the Plaintiffs' ability not only to prove the elements of their claims, but to refute the Defendants' asserted defenses." (Pls.' Mot. Mem. Supp. Default J. (Docket No. 258) at vi-xvi.) Because Plaintiffs do not identify which Defendants are responsible for specific acts of alleged spoliation but rather group them together as "Defendants," and because all of the alleged

3

misdeeds Plaintiffs point to occurred before this lawsuit was filed, the court must answer two preliminary questions: First, which Defendant or Defendants had a duty to preserve the particular piece of evidence that Plaintiffs claim was destroyed or mishandled? Second, should the responsible Defendant or Defendants have known or reasonably foreseen that litigation was imminent?

Plaintiffs give an eleven-page description of what they claim was Defendants' "tampering with and destruction of evidence." (Pls.' Mot. Mem. Supp. Default J. (Docket No. 258) at vi.) They divide their claims into several sections and subsections. The court will follow Plaintiffs' grouping of their claims.

### A. THE SCENE OF THE SHOOTING

#### 1. Rendering Aid

Plaintiffs argue that had Mr. Murray received medical help, he might have survived and could give his account of what happened. In the Plaintiffs' reply to the Defendants' response to the motion for default, they state: "It goes without saying, that had the officers simply attempted to stop the bleeding . . . Murray may have survived to give a recitation of facts fully supportive of the Plaintiffs['] cause of action." (Pls.' Reply to Mot. Mem. Supp. Default J. (Docket No. 317) at i.)

Plaintiffs are correct that none of the law enforcement officers who were present at the scene attempted to give aid to Mr. Murray during the approximately thirty minutes he lay bleeding on the ground before the ambulance arrived. But this fact, troubling as it is, is not a basis for spoliation sanctions. Despite what Plaintiffs allege "goes without saying," (Pls.' Mot. Mem. Supp. Default J. (Docket No. 258) at 10), Plaintiffs have not shown that they were

4

prejudiced by the failure of the officers to act because they have not submitted evidence in support of their contention. In fact, the record evidence shows otherwise.

Dr. Edward A. Leis, the Deputy Chief Medical Examiner who did the examination of Mr. Murray's body, testified at the June 6, 2013 Evidentiary Hearing,[1] that in his opinion, the wound Mr. Murray received was "an un-survivable injury." (Evidentiary Hr'g Tr. 71, June 6, 2013.) Plaintiffs have presented no evidence to rebut Dr. Leis' opinion. Without evidence showing that Mr. Murray could have survived, the court will not impose sanctions on the Defendants for not rendering aid to Mr. Murray.

    2.    <u>The .380 Firearm</u>[2]

Because the shooting took place on the Uintah and Ouray Indian Reservation (the Reservation), the F.B.I. had jurisdiction over the investigation.[3] On the morning of the incident, Special Agent Rex Ashdown went to the scene of the shooting. He arrived after the ambulance had taken Mr. Murray to the hospital. Soon after he had arrived, Agent Ashdown was told that Mr. Murray had shot himself. Mr. Ashdown admitted at the June 6 Hearing that this information had "some influence" on how he carried out his investigation of the shooting. (<u>Id.</u> 122.)

The .380 was found close to where Mr. Murray was lying. Agent Ashdown made the decision about what tests to do, or not do, on the firearm. He alone chose to have no tests done on the firearm, including ballistics tests and tests for fingerprints. (<u>See id.</u> 132, 135-36.) Agent

---

[1] Reference to the June 6, 2013 Spoliation Hearing will be cited as "(Evidentiary Hr'g Tr. ___, June 6, 2013.)," "(Hr'g Tr. ___.)," and "(<u>Id,</u> ___.)"

[2] Photographs from the scene show the firearm. (<u>See</u> Hr'g Ex. 5U.)

[3] No one from the federal government has been named as a Defendant.

5

Ashdown testified that he took a photograph (Evidentiary Hr'g Ex. 5U, June 6, 2013) of the gun, which showed the firearm with a "stove pipe jammed shell casing," that is, a shell that had been fired but was not ejected from the firearm,

Agent Ashdown chose not to have a test fire done on the firearm. (Hr'g Tr. 135.) He explained:

> Mr. Ashdown: There was no reason to request a test fire on it. We had -- the only purpose -- the only thing that would have been proved by the test firing is if the gun functions.
>
> Court: How about whether it had been fired? Could you have told that from the test when the gun had been fired?
>
> Mr. Ashdown: That could have been determined that it had been fired but it was already obvious that the gun had been fired.
>
> Court: Why was it obvious that it had been fired?
>
> Mr. Ashdown: There were two spent shell casings on the ground, plus a spent shell casing inside of the gun that had been fired and not totally ejected.
>
> Court: Tell me, so there were two spent shell casings, and they were quite near the gun, is that right? They were near the gun?
>
> Mr. Ashdown: Within a radius that would be expected with the ejection system of the gun.
>
> Court: Were you able to definitively determine that those spent shell casings came from that gun?
>
> Mr. Ashdown: There were no tests to definitively do that. With the information I had, and what I had seen at the scene, there was no reason to doubt that those were the gun's shell casings from that gun.

(Id. 132-33.) Agent Ashdown also decided that he would not have a fingerprint analysis down on Mr. Murray's firearm. "At this point in the investigation, everything had been consistent with what I had been informed and what I had seen. I knew that Mr. Murray had had that gun in his possession." (Id. 136.)

Agent Ashdown did not discuss his decisions or reasons for not having tests done on the firearm with any of the Defendants. After leaving the scene, Agent Ashdown placed the firearm in evidence at the F.B.I. office in Vernal, Utah.

Agent Ashdown retired from the F.B.I. on May 31, 2007. Not long after the shooting but before Agent Ashdown's retirement, members of Mr. Murray's family met with him at his office. Agent Ashdown described the family as "upset about their son's death and maybe believed something else happened." (Hr'g Tr. 186.)

After Agent Ashdown retired, Special Agent David Ryan replaced him. He did not order tests on the firearm because, he testified, "That part of the investigation was handled by Agent Ashdown. And so no, I did not second guess that part of the investigation." (Id. 193.) Agent Ryan focused his investigation on the purchase of the firearm. He found that the purchase of the firearm was a "straw purchase," that is, as Agent Ryan explained, "an illegal purchase that was provided to a restricted person." (Id. 193.) After the completion of the federal criminal matter involving the firearm,[4] the judge hearing the case signed, on November 14, 2008, an order forfeiting the firearm to the government. Shortly thereafter, the firearm was destroyed. Agent Ryan did not notify any of the Defendants that the firearm would be destroyed.

On March 28, 2008, several months before the firearm was destroyed, the Plaintiffs sent a Notice of Claim (Notice) to the Vernal City Police Department, the Utah Highway Patrol, the Uintah County Sheriff, Uintah County and Detective Norton. The first paragraph of the Notice reads:

---

[4] The purchaser pled guilty in federal court to a charge of making a false statement in connection with the purchase of the firearm.

**Please Take Notice That:**

Pursuant to UTAH CODE ANN. §63-30d-401, the Claimant, Debra Jones, on behalf of the estate of her son, Todd Rory Murray, deceased, hereby files written notice of her claims against the Vernal City Police Department, Detective Vance Norton, individually, and in his capacity as a Vernal City Police Officer, Vernal City, the State of Utah, the Utah Highway Patrol, a division of the Utah Department of Public Safety, Uintah County, the Uintah County Sheriff's Office, and John Does 1-10. This notice should not be deemed to waive any cause of action that Debra Jones may have against any individual or entity, governmental or otherwise, who may later be determined to be ultimately responsible for the damages she has sustained.

(Notice of Claim, Ex. K to Pls.' Mot. Mem. Supp. Default J. (Docket No. 258-12) at 3.)

The Notice provides a summary of the events that occurred on April 1, 2007, beginning with the police pursuit and ending with the medical examiner's examination and "autopsy"[5] of Mr. Murray's body. The Notice then lists the claims that Plaintiffs intended to bring:

> The nature of the claims asserted herein is premised upon the use of excessive and unreasonable police force. Claimant intends to seek a judicial remedy for the above misconduct and constitutional violations. Specifically, claimant intends to file suit and will include the following claims:
>
> • Violations of 42 U.S.C. § 1983.
> • Deprivation of Claimants' rights under the Fourth Amendment and Fourteenth Amendment to the Constitution of the United States and Article I Section 14 of the Utah Constitution to be free of unreasonable search and seizure.
> • Deprivation of Claimants' rights under the Fourteenth Amendment to the Constitution of the United States and Article 1 Sections 2 and 7 of the Utah Constitution not to be deprived of life, liberty or property without due process of law, and the right to equal protection of the laws.
> • Deprivation of Claimants' rights under the Fifth Amendment to the Constitution of the United States not to be deprived of life, liberty or property without due process of law, and not to be compelled in any criminal case to be a witness against himself.
> • Assault and battery.

---

[5]The Notice describes this as an "autopsy" undoubtedly because the Plaintiffs were unaware that Dr. Leis had decided only to perform a physical examination.

- Intentional and/or negligent infliction of emotional distress, extreme and outrageous conduct.
- Negligence.
- Wrongful death.

(Notice of Claim, Ex. K to Pls.' Mot. Mem. Supp. Default J. (Docket No. 258-12) at 6-7.)

Even after the Notice was sent, no one contacted the F.B.I. about the firearm although, as Agent Ryan testified, he believed "everyone knew" that the F.B.I. had the firearm and if any of the law enforcement agencies had contacted him and requested that tests be done on the firearm, he "possibly" would have agreed. (Hr'g Tr. 198.)

Plaintiffs contend that because the firearm was not forensically tested before it was destroyed they have been prejudiced because they "will never be able to determine":

a. If it was an operable firearm;

b. If it contained blowback (blood/tissue) which would have been present if the gun had been pressed up against Murray's head when it was fired;

c. If it fired the shell casings that were found at Murray's feet; and

d. If it contained fingerprints.

(Pls.' Mot. Mem. Supp. Default J. (Docket No. 258) at vii-viii.)

Which Defendant or Defendants had a duty to preserve the .380 firearm and could have reasonably foreseen that litigation was imminent?

Defendants Dave Swenson, Craig Young, Rex Olsen and Jeff Chugg were Utah Highway Patrol Troopers. Sean Davis was an Investigator with the Utah Department of Natural Resources, Division of Wildlife Resources. None of these Defendants (the State Defendants) was involved in the actual shooting.[6] None of the State Defendants took possession or had

---

[6]Today, the court has issued a separate order that describes the actions of the various Defendants.

control of the firearm during the investigation. They were not notified that the firearm was to be destroyed. The Notice was not sent to any of the State Defendants individually and there is no evidence that they knew of it. For these reasons, the State Defendants had no duty to preserve the firearm because they did not know, and did not have reason to know, that the firearm would be relevant to any litigation brought against them. Accordingly, the State Defendants cannot be liable for the gun's destruction.

Defendants Bevan Watkins, Troy Slaugh and Anthoney Byron (Uintah County Defendants) were deputies with the Uintah County Sheriff's Office. Similar to the State Defendants, the Uintah County Defendants were not involved in the actual shooting; they did not take possession or have control of the firearm; they were not notified that the firearm was to be destroyed; and they were not sent the Notice and no evidence in the record shows they knew of the Notice. Without notice, the Uintah County Defendants did not have a duty to preserve the firearm and could not have reasonably foreseen that they would be subject to any claims involving the firearm. For these reasons, the court will not find the Uintah County Defendants liable. And because the individual Uintah County Defendants are not liable for the destruction of the firearm, their agency, Uintah County, will not be held liable.

Detective Norton and his agency, Vernal City, have also been named as Defendants. Detective Norton was involved in the shooting in which Mr. Murray died. By his own admission, Detective Norton fired two shots at Mr. Murray. Unlike the State and Uintah County Defendants, Detective Norton received the Notice on April 1, 2008. (Hr'g Tr. 242.) He testified that when he received it, he was unaware of any claim that he had shot Mr. Murray and believed that the sole issue was about jurisdiction. When he received the Notice, Detective Norton took it

to the Vernal City Attorney, Dennis Judd, and asked him what should be done. There is nothing in the record about what advice Mr. Judd gave Detective Norton.

Although Detective Norton knew that litigation was imminent and he was involved in the shooting, the court finds that he should not be sanctioned for failing to have the firearm tested and failing to stop the F.B.I.'s destruction of the firearm. Agent Ashdown testified that he did not discuss what testing would be done on the firearm with any of the Defendants, although if any of the other agencies involved had requested that certain tests be performed, he would have had the tests done as "a courtesy." (Hr'g Tr. 171.) And Agent Ryan did not notify any of the Defendants that the firearm was to be destroyed. Therefore, when he received the Notice, Detective Norton did not know that the F.B.I. had performed no tests on the firearm and he did not know that it would soon be destroyed. He also sought advice from an attorney about what actions he took. In light of all the above circumstances, there was no culpability or even negligence on the part of Detective Norton and the court will not impose sanctions on him.

The court cannot determine whether sanctions should be imposed on Defendant Vernal City for failing to test Mr. Murray's firearm before its destruction because the Plaintiffs have not specifically identified what theory of liability, if any, would apply. If Plaintiffs wish to file a memorandum on the issue of Vernal City's liability for spoliation sanctions for the failure to test and the destruction of the firearm, they may do so within three weeks of the date of this order. Defendant Vernal City may file an opposition brief three weeks after having received Plaintiffs' memorandum. Plaintiffs' reply, if any, is due ten days after receiving Vernal City's opposition.

3. Detective Norton's Firearm

After the shooting, Gary Jensen, who was the Vernal City chief of police, took Detective

Norton's firearm after the shooting. He kept it for several days before returning it to Detective Norton. Chief Jensen visually examined the firearm and, at the June 6 Hearing, described it as in "pristine condition." (Hr'g Tr. 216.) He had no tests performed on the firearm and did no additional examination.

Plaintiffs argue that the failure to test or forensically examine Detective Norton's firearm has prejudiced them because they will never be able to determine:

> a. If it contained blowback (blood/tissue) which would have been present if the gun had been pressed up against Murray's head when it was fired;
>
> b. If it fired the shell casings found where Norton claimed he fired back; and
>
> c. If it contained fingerprints.

(Pls.' Mot. Mem. Supp. Default J. (Docket No. 258) at viii-ix.)

The court agrees with the Plaintiffs' argument that Chief Jensen's visual examination was not sufficient and that Plaintiffs have possibly been prejudiced by the lack of evidence that testing might have uncovered. But the court must decide which Defendant or Defendants should be held liable.

Which Defendant or Defendants had a duty to preserve the evidence from Detective Norton's firearm and could have reasonably foreseen that litigation was imminent?

The State Defendants and Uintah County Defendants had no responsibility to ensure that Detective Norton's firearm was tested. As discussed above, they were not involved in the shooting. If they were aware at all of what happened to Detective Norton's firearm after the shooting, they would have only seen or known that Chief Jensen had taken it. These Defendants had no reason or obligation to make further inquiry.

As part of his investigation, Agent Ashdown possibly should have taken Detective

12

Norton's firearm to have necessary tests performed. But Agent Ashdown is not a named Defendant.

After the shooting, Detective Norton gave his firearm to Chief Jensen. There is no evidence that he could dictate to his superior officer, Chief Jensen, what to do with the firearm or which tests should be conducted. The court finds that Detective Norton had no further obligation to preserve evidence from his firearm and he will not be held liable for spoliation sanctions regarding his firearm.

Vernal City's failure to fully examine Detective Norton's firearm occurred before the Notice was sent and before litigation began. But in light of the seriousness of the incident and the involvement of officers on the Reservation where they did not have jurisdiction, litigation could reasonably be expected. But the court cannot presently determine whether sanctions should be imposed on Defendant Vernal City because the Plaintiffs have not specifically identified what theory of liability, if any, would apply. Similarly, as noted above, if the Plaintiffs wish to submit a memorandum on the issue of Vernal City's liability for spoliation sanctions for the failure to test Detective Norton's firearm, they may do so in accordance with the briefing schedule described above. Defendants may respond following that same schedule.

4.   Critical Evidence

According to Plaintiffs, Defendants failed to preserve other critical evidence. Specifically, Plaintiffs allege that:

   a. Defendants failed to swab Mr. Murray's and Detective Norton's hands for gun shot residue;

   b. Defendants failed to forensically examine Mr. Murray's and Detective Norton's clothing for the presence of blood or tissue;

13

c. Defendants inadequately documented the scene by failing to search for all fired bullets and performed an unsatisfactory blood splatter analysis, and in doing so, eliminated the Plaintiffs' opportunity to reconstruct or verify the scene as portrayed by Defendants; and

d. Defendants did not conduct a search of Detective Norton's person and did not search, process, or photograph Detective Norton's vehicle.

(See Pls.' Mot. Mem. Supp. Default J. (Docket No. 258) at ix-x.)

      a.      Failure to Test and Swab Mr. Murray's and Detective Norton's Hands and Clothing

Dr. Edward Leis, the Deputy Chief Medical Examiner who conducted the examination, did not test Mr. Murray's clothing or swab his hands. He testified that his office did not typically do any testing on clothing other than visually inspect it. He also testified that if an agency requested additional testing, the clothing would be sent to that agency for testing. Dr. Leis stated that the F.B.I. requested an examination of Mr. Murray's body, but did not request that any additional testing be done to the clothing.

Dr. Leis explained that he did not have Mr. Murray's hands swabbed and tested because Mr. Murray's death was reported to him as a suicide.[7] He testified in his deposition that had an agency requested, he would have swabbed the hands and given the swab to the agency. The agent in charge of the investigation, Agent Ashdown, did not order a gunshot residue test on Mr. Murray's hands because the F.B.I. had stopped doing the tests long before this investigation as "they were inherently unreliable." (Hr'g Tr. 142.)

Detective Norton admitted that he twice fired his firearm, so testing his hands for gun shot residue would only confirm this. Moreover, Detective Norton could not be expected to

---

[7]Dr. Leis testified in his deposition that his crime lab stopped routinely doing gunshot residue examinations in the 1990s. (Leis Dep. 46.)

swab his own hands or test his own clothing. Therefore he is not liable for spoliation sanctions for failure to test his own firearm and his clothing.

Since an officer from the Vernal Police Department, Detective Norton, was involved in the shooting, it appears that Chief Jensen had taken the responsibility to collect certain evidence, such as Detective Norton's firearm. Perhaps Chief Jensen should have collected Detective Norton's clothing and swabbed Detective Norton's hands to test for the presence of blowback or tissue. But Chief Jensen is not a named Defendant. Vernal City could potentially be liable for Chief Jensen's failure to swab Detective Norton's hands and examine his clothing, but the Plaintiffs have not shown what theory of liability should apply.

None of the named Defendants can be held liable for these alleged misdeeds, because Agent Ashdown and Keith Campbell[8] were in charge of the investigation. None of the Defendants in this case, except possibly Vernal City, had a duty to swab Detective Norton's hands or examine his clothing. Because of this, the court will not find the State Defendants or the Uintah County Defendants liable.

If Plaintiffs want to file a memorandum explaining why Vernal City should be held liable for failing to test Detective Norton's hands and clothing, they may do so in accordance with the briefing schedule described above. Defendants may respond following that same schedule.

---

[8] Officer Campbell was an "undersheriff or chief deputy for the Uintah Sheriff's office" and a deputy medical examiner for the Office of the Medical Examiner. (Campbell Dep. 10.) During this investigation, Officer Campbell testified that he was acting in his role as deputy medical examiner. (Id. at 9.)

b. Inadequate Scene Documentation, Failure to Search for Fired Bullets, and Inadequate Documentation of Blood Splatter

Agent Ashdown and Officer Campbell were in charge of documenting the physical evidence for the investigation. Agent Ashdown led the F.B.I.'s investigation and Deputy Campbell was acting in his role as deputy medical examiner for the Utah State Office of the Medical Examiner. None of the named Defendants had the responsibility or duty to investigate and document the actual scene of the shooting (although certain Defendants, including Detective Norton, took photographs of the scene). Because none of the Defendants had a duty to document the scene, search for fired bullets, or document blood splatter, the court will not impose sanctions on any of the Defendants.

c. Failure to Search Detective Norton or His Automobile

Plaintiffs do not explain what relevant evidence was lost because Detective Norton and his vehicle were not searched. And there is no evidence that Plaintiffs were "actually, rather than merely theoretically" prejudiced by this omission. See Burlington N. & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1032-33 (10th Cir. 2007). Because Plaintiffs have not met their burden, and have only alleged that it is possible that relevant evidence was lost when these searches were not performed, the court will not impose sanctions on the Defendants.

**B.     MURRAY'S BODY**

1. Ashley Valley Medical Center

Plaintiffs argue that the Defendants destroyed or lost relevant evidence that could have been found on Mr. Murray's body while he was in the emergency room at Ashley Valley Medical Center and, later, at Blackburn Mortuary. Specifically, they allege:

16

>a. Murray's body was compromised during photographs by the manipulation of the wound by Defendants. Specifically, Defendant Anthoney Byron inserted a finger into Mr. Murray's gunshot wound and such manipulation could have affected the bullet trajectory determination;
>
>b. Defendants improperly disrobed Mr. Murray in the ER, resulting in the possible destruction of trace evidence; and
>
>c. Defendants destroyed or failed to prepare chain of custody documents for the extraction of a blood sample taken in the ER.

(See Pls.' Mot. Mem. Supp. Default J. (Docket No. 258) at xi-xii.)

Plaintiffs are correct that Defendant Anthoney Byron inserted his finger in one of the wounds in Mr. Murray's head, Dr. Leis testified that this did not change his conclusion that Mr. Murray had taken his own life. (Hr'g Tr. 58-59.)

Ben Murray, who was then a detective with the Vernal City Police Department, was the person who decided to remove Mr. Murray's clothes so he could photograph all the injuries on Mr. Murray's body. (Murray Dep. 71.) But Mr. Murray is not a named Defendant.

The fact that blood was taken in the emergency room and no chain of custody was kept does not prejudice Plaintiffs because blood was also taken from Mr. Murray's body at the medical examiner's office. This blood was properly documented and tested by the medical examiner. Only the blood drawn by the medical examiner was used to determine the drug and alcohol levels in Mr. Murray's blood. Because of this, Plaintiffs' claim that Defendants' destruction or failure to maintain chain of custody over the blood they extracted in the ER fails.

2. Blackburn Mortuary

Plaintiffs also claim that Defendants "improperly handled and tampered with" Mr. Murray's body at Blackburn Mortuary. Plaintiffs allege that:

17

> a. Vernal City Police Chief Gary Jensen's attempt to draw blood from Mr. Murray's heart at the mortuary and his direction to a mortuary employee to make an incision in Mr. Murray's jugular vein to draw blood "obviously contaminated [Mr.] Murray's body and, consequently, invalidated the toxicology results;
>
> b. Defendants destroyed or did not prepare chain of custody documents for the evidence that was or should have been obtained at the mortuary because: "1) no photographs were taken; 2) there is no evidence [Mr.] Murray was placed in a sealed body bag; 3) no evidence log was made; [and] 4) no personnel log was compiled;" and
>
> c. Defendants destroyed or did not prepare chain of custody documents for the extracted blood sample taken at Blackburn Mortuary, "making it impossible for Plaintiffs to determine if the sample was properly preserved."

(See Pls.' Mot. Mem. Supp. Default J. (Docket No. 258) at xi-xii.)

Plaintiffs suffered no prejudice from Chief Jensen's drawing of blood from Mr. Murray's body and failure to establish chain of custody because, as discussed above, blood was taken and the blood draw was documented at the office of the medical examiner with the results used in the medical examiner's final report. Similarly, Plaintiffs have not shown how they were prejudiced by the fact that no photographs were taken at the mortuary, no evidence log was made, and no personnel log was compiled. And, as will be discussed later in this order, there is no evidence showing when Mr. Murray's body was placed in a body bag.

Even if the court concluded that these acts prejudiced the Plaintiffs, the Plaintiffs have failed to allege which Defendant or Defendants had a duty to take photos at the mortuary, place Mr. Murray's body into a sealed body bag, or create a log. Plaintiffs' blanket claim that all Defendants had these duties does not persuade the court and does not meet the necessary requirements for the court to impose sanctions.

### 3. Office of the Medical Examiner

Plaintiffs contend that because a full autopsy was not done on Mr. Murray's body, they were prejudiced. Specifically, Plaintiffs allege that, "[Mr.] Murray's body was improperly handled by the [Office of the Medical Examiner] because the [Office of the Medical Examiner] failed to perform a full forensic autopsy as statutorily mandated under UTAH CODE ANN. § 26-4-13(1)." (See Pls.' Mot. Mem. Supp. Default J. (Docket No. 258) at xiii.) And Plaintiffs allege that the Defendants themselves failed to do more than an external examination of Mr. Murray's body.

Though Agent Ashdown requested an autopsy of Mr. Murray, Dr. Leis decided that an autopsy was not necessary and did not perform one. Dr. Leis is not a Defendant and, as he testified, he alone made the decision not to do an autopsy based on "[t]he physical findings, the lack of any indication that there was any type of struggle, the contact gunshot wound, the relative position between the two individuals." (Hr'g Tr. 88.) None of the Defendants bear any responsibility for Dr. Leis' decision not to perform an autopsy.

### 4. Trace Evidence

Plaintiffs argue that critical evidence was lost because Mr. Murray's hands were not bagged properly and Mr. Murray's body was not properly preserved because the body bag was incorrectly sealed. Nothing in the record shows when Mr. Murray was placed in a body bag or who placed him in the body bag.

There is no evidence to show that Mr. Murray's hands were bagged improperly. Plaintiffs argue that Mr. Murray's hands must have been improperly bagged because some photographs showed his hands bagged and others did not, but there is no evidence to show who,

when, and where Mr. Murray's hands were bagged, or when the bags were removed. And there is no evidence to show that the body bag was sealed. Similarly, there is no evidence on the record to show that it wasn't sealed. Even if Plaintiffs showed how this lack of documentation caused them prejudice, the court cannot find any Defendant liable because Plaintiffs have not identified which Defendant or Defendants would be responsible for this alleged spoliation.

### III. CONCLUSION

Because Plaintiffs have failed to established that spoliation sanctions are appropriate against the named Defendants, Plaintiffs are not entitled to an entry of default against any of the Defendants. Plaintiffs' motion for default (Docket No. 258) is DENIED.

Similarly, Plaintiffs' motion for spoliation sanctions against Defendants Vance Norton, Dave Swenson, Craig Young, Rex Olsen, Jeff Chugg, Anthoney Byron, Bevan Watkins, Troy Slaugh, Sean Davis, and Uintah County (Docket No. 258) is DENIED.

The court takes the motion for lesser sanctions against Vernal City (Docket No. 258) under advisement pending additional briefing as set forth in this order.

SO ORDERED this 7th day of March 2014.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
U.S. District Court Judge