IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DEBRA JONES and ARDEN C. POST, individually and as the natural parents of Todd R. Murray; and DEBRA JONES, as personal representative of the Estate of Todd R. Murray, for and on behalf of the heirs of Todd R. Murray,<br><br>　　　　　　Plaintiffs,<br><br>　　vs.<br><br>VANCE NORTON, Vernal City police officer in his official and individual capacity; et al.,<br><br>　　　　　Defendants. | **ORDER**<br><br>**AND**<br><br>**MEMORANDUM DECISION**<br><br>Case No. 2:09-CV-730-TC |

On April 1, 2007, after police officers' high speed car chase and subsequent foot pursuit

of Todd Murray on the Uintah and Ouray Indian Reservation (the Reservation), Mr. Murray

suffered a gun-shot wound to the head. Mr. Murray, who was twenty-one-years old and a

member of the Ute Indian Tribe, died that same day in a local hospital. Mr. Murray's parents and

Debra Jones, Mr. Murray's mother and the executor of his estate, filed this civil rights lawsuit,

alleging that his death was caused by the unconstitutional acts of local law enforcement. This

matter comes before the court on cross-motions for summary judgment.[1] For the reasons set

forth below, the court finds that in all but one instance no unconstitutional violation occurred,

and, in that one instance where a violation did occur, the officer is entitled to qualified immunity.

---

[1]The Plaintiffs also filed a motion for default judgment against the Defendants on the basis of "Tampering and Destruction of Critical Evidence" or, in the alternative, spoliation sanctions. (Docket No. 258.) The court will address that motion in a separate order.

Accordingly, the Defendants' motions for summary judgment are GRANTED and Plaintiffs' cross-motion is DENIED.

## I. PROCEDURAL BACKGROUND

The Plaintiffs bring civil rights claims under 42 U.S.C. § 1983 and § 1985 against the municipalities of Uintah County and the City of Vernal, and against law enforcement officers, in their individual, as well as their official, capacities. The individual officers are four troopers with the Utah State Highway Patrol (Jeff Chugg, Dave Swenson, Craig Young and Rex Olsen); three Uintah County Sheriff Deputies (Bevan Watkins, Troy Slaugh and Anthoney Byron); Sean Davis, who is an investigator with the Utah Division of Wildlife Resources (DWR); and Vance Norton, a detective with the Vernal City Police Department (collectively, the Individual Defendants). The Plaintiffs also allege two state law claims (assault/battery and wrongful death) against Detective Norton individually.[2]

In their § 1983 claims against the Individual Defendants, the Plaintiffs allege illegal seizure, excessive force, and failure to intervene to prevent the officers' unconstitutional acts. Under § 1985, they allege conspiracy to obstruct justice and conspiracy to violate Mr. Murray's civil rights based on racial animus. (Vernal City is also named in the Plaintiffs' § 1985 conspiracy claims.) All of the Individual Defendants filed motions for summary judgment on the basis that no constitutional right was violated, but even if there were a violation, they are entitled

---

[2]The Plaintiffs originally brought thirteen causes of action. During the course of the litigation, the Eighth and Thirteenth Causes of Action were dismissed. (See March 29, 2013 Order (Docket No. 303); July 26, 2012 Order (Docket No. 216).) This order addresses the remaining eleven claims.

to qualified immunity from the suit.[3]  In response, the Plaintiffs filed a cross motion for partial summary judgment against the Individual Defendants on the illegal seizure, excessive force, and failure to intervene claims.[4]

The Plaintiffs also bring claims against Uintah County and the City of Vernal (collectively, the Municipalities), that employ many of the Individual Defendants.  The Plaintiffs allege that the Municipalities failed to train or supervise their officers about jurisdictional limits on their law enforcement authority, probable cause to arrest, and the proper use of force, and failed to implement policies regarding the same.

Uintah County and Vernal City filed motions for summary judgment, arguing that (1) there was no violation of Mr. Murray's civil rights; (2) there is no respondeat superior liability under § 1983 and § 1985; (3) there is no evidence of a causal link between any constitutional violation and the Municipalities' alleged failure to train, supervise, or implement policies; and (4) the jurisdiction arguments fail because there is no evidence that the officers knew Mr. Murray was a member of the Ute Tribe until after Mr. Murray was shot and examined by the EMTs.

---

[3]For the City and County Defendants, see Vernal City Detective Vance Norton's Motion for Summary Judgment (Docket No. 270), Uintah County Deputy Anthoney Byron's Motion for Summary Judgment (Docket No. 269), Uintah County Deputies Bevan Watkins' and Troy Slaugh's Joint Motion for Summary Judgment (Docket No. 266), and Uintah County and Vernal City's Joint Motion for Summary Judgment (Docket No. 271).  For the State Defendants, see State Trooper Craig Young's Motion for Summary Judgment (Docket No. 275), State Trooper Dave Swenson's Motion for Summary Judgment (Docket No. 276), State Trooper Jeff Chugg's, State Trooper Rex Olsen's, and DWR Officer Sean Davis' Joint Motion for Summary Judgment (Docket No. 277).

[4](See Pls.' Mot. Partial Summ. J. (Docket No. 273).)

3

## II. <u>FACTUAL BACKGROUND</u>[5]

### A.    THE CAR CHASE

On the morning of April 1, 2007, Mr. Murray was a passenger in a car driven by Uriah Kurip.  Mr. Murray and Mr. Kurip were driving west on Highway 40 in Uintah County near Vernal, Utah.  Trooper Dave Swenson of the Utah Highway Patrol was parked near mile marker 134.[6]  Mr. Murray and Mr. Kurip drove past Trooper Swenson's parked patrol vehicle.  Using his radar, Trooper Swenson recorded the car's speed at 74 miles an hour in a 65 miles-per-hour zone.

Trooper Swenson activated his overhead lights and began following the car, intending to make a traffic stop.  Instead of stopping, Mr. Kurip drove faster.  Trooper Swenson notified the dispatch officer that he was involved in a high-speed chase.  For approximately thirty minutes, Trooper Swenson pursued the car, in and out of the Reservation's boundaries.[7]  At times, the two cars reached speeds of approximately 125 miles an hour.  At an area called "Four Corners," Mr. Kurip ran the car off the road.  When Trooper Swenson tried to use his patrol car to block Mr. Kurip's car, Mr. Kurip accelerated, struck the patrol car, and drove away.  Trooper Swenson was

---

[5]The Plaintiffs have filed two unopposed motions to supplement the record (<u>see</u> Docket Nos. 407 and 408).  In their motions, they list documents (such as complete deposition transcripts) that the court requested post-briefing.  They ask the court to add those documents to the record.  The court will not grant a wholesale supplement of those documents to the record. But to the extent the court cites to evidence <u>within</u> those documents that was not cited in the parties' briefing, the court officially adds that evidence to the record.  Accordingly, the two motions are granted in part and denied in part.

[6]The mile marker is near the boundary of the Reservation.

[7]The boundaries of the Reservation are often difficult to discern because the Reservation contains checkerboard plots of land that intermingle with state land.

able to see inside the car and described the occupants to dispatch as "two tribal males."[8]  He

continued his pursuit.  Upon learning of the chase, other officers began heading to Trooper

Swenson's location to provide backup assistance.

Detective Vance Norton, who was off-duty and driving in his own car, saw the two cars

speed by.  He says he saw the two men in the car and thought they were Hispanic.  He called

dispatch on his cell phone to ask what was happening, and the dispatch officer told him that it

was a high speed chase but that other officers were not yet in the area.  Detective Norton told

dispatch that he would follow the chase until another officer arrived.  He did not have a police

radio in his car so he could not listen to regular dispatch reports.  Detective Norton did not hear

Trooper Swenson say the two men in the car were "tribal males."

About the same time, Lieutenant Jeff Chugg, supervisor of the Utah Highway Patrol

troopers, was at home when he received a call that one of his officers was involved in a high-

speed chase.  He began to monitor radio traffic and was on the phone with dispatch during the car

chase.  Soon after he began monitoring the pursuit, he saw on a CAD[9] screen the words "Trooper

Swenson had advise[d] that it was a car with two tribal males and Nevada plates."[10]  At some

point, he got into his car and drove to what had by then become a crash scene.

Trooper Rex Olsen was on duty at the time of the car chase.  He was in his patrol car

when he heard over the radio about the high-speed chase.  He drove toward Trooper Swenson's

location to provide backup.

---

[8]Swenson Dep. 104.

[9]CAD stands for "Computer-Aided Dispatch."

[10](Lt. Jeff Chugg Incident Report, Ex. 1 to Chugg Dep. (Docket No. 278-18) at 1.)

Deputy Troy Slaugh, from the Uintah County Sheriff's Department, also learned that the high speed chase was happening. He called his colleague, Deputy Bevan Watkins (who was a "K-9" officer[11] at the time) to let him know that Uintah County officers were responding to help Trooper Swenson. Deputy Watkins testified that it "was very common to call out a canine when there was a pursuit taking place because it was common for individuals to bail out of a vehicle that was stopped."[12] Deputy Watkins called the dispatch operator to offer his assistance. He received "consent" to go to the scene with his dog.[13] He then began driving in the direction of the high speed chase.

About the same time, Utah Division of Wildlife Resources (DWR) Investigator Sean Davis was on patrol in a nearby area when he learned of the chase over the radio. He drove toward Trooper Swenson's location.

Similarly, Trooper Young and Deputy Byron drove to the scene when they heard about the high speed chase. Both Trooper Young and Deputy Byron testified that they did not hear any reference to "tribal males."

## B.     THE FOOT CHASE

The car chase ended when Mr. Kurip lost control of the car and came to a stop on Turkey Track Road, which is located on the Reservation. Both Mr. Kurip and Mr. Murray got out of the car and ran. Trooper Swenson arrived almost immediately after the Kurip car stopped and Mr.

---

[11]A K-9 officer is an officer who uses a trained police dog to do such things as track fugitives and detect the scent of drugs.

[12]Watkins Dep. 77.

[13]Id. at 77.

6

Kurip and Mr. Murray got out of the car. As they began running, Trooper Swenson got out of his car, pointed his gun at Mr. Kurip and Mr. Murray, and ordered them to get down on the ground. The men did not stop and continued running in different directions.[14] Trooper Swenson did not see any weapons in the men's hands or in their waistbands. Trooper Swenson took the keys from the Kurip car, returned to his own car, and then followed Mr. Kurip because Mr. Kurip was the driver of the vehicle. After a short drive, Trooper Swenson again got out of his car and began chasing Mr. Kurip on foot. He quickly caught and arrested Mr. Kurip.

Detective Norton was the first officer (after Trooper Swenson) to arrive at the scene. He saw Trooper Swenson standing on a hill with a man in handcuffs (Mr. Kurip) and asked Trooper Swenson about the other man (Mr. Murray). (The court notes that none of the law enforcement officers on the scene knew Mr. Murray or Mr. Kurip.) Trooper Swenson told Detective Norton that the man had run away and pointed in the direction where Mr. Murray had fled. Detective Norton began his pursuit, first in his car and then on foot. Soon after, Deputy Byron and Trooper Young arrived at the crash scene in their separate cars. As Trooper Swenson had done with Detective Norton, he asked the two officers to capture the fleeing passenger.[15] The three officers, all of whom were armed, pursued Mr. Murray, first in their own patrol cars and then on foot. Trooper Swenson stayed at the crash scene with Mr. Kurip.

---

[14]A video camera mounted on the dashboard of Trooper Swenson's car captured this scene. (See Trooper Swenson Dash Cam Video Excerpts, Ex. H to State Defs.' Mem. Opp'n (Docket No. 311).)

[15]Trooper Swenson does not dispute for purposes of summary judgment that he asked the officers to go after Mr. Murray. Deputy Byron presents evidence that he does not remember talking to Trooper Swenson at the scene (see Defs. Byron, Norton, Slaugh, Uintah County, Vernal City, and Watkins' Mem. Opp'n (Docket No. 305) at 15), but the variation in each party's version of this fact is not material to the court's analysis.

Detective Norton, after driving a short distance, got out of his car when he saw Trooper Young and Deputy Byron.

Trooper Young and Deputy Byron saw Detective Norton standing on the top of a nearby hill. The three men spoke and decided that they would take different routes to locate Mr. Murray.

As Detective Norton was crossing over a hill, he saw Mr. Murray "coming around another hill."[16] Detective Norton believed that Mr. Murray had something, possibly a gun, in his hand. Mr. Murray ran towards Detective Norton. Detective Norton shouted at Mr. Murray, "Police, get on the ground."[17] Mr. Murray did not obey the command. When Mr. Murray was approximately 140 yards from Detective Norton, he fired at Detective Norton.[18] Detective Norton saw the bullet hit the ground in front him and fired twice at Mr. Murray. Detective Norton testified that he "actually saw my rounds actually hit this dirt or this rock on each side of him –."[19]

After firing the two shots, Detective Norton turned around and, still watching over his shoulder, ran back up the hill. When he reached a distance where he believed that Mr. Murray could not shoot him, he took out his cell phone to call dispatch. Detective Norton described what saw:

---

[16]Norton Dep. 133.

[17]Id. at 137.

[18]Detective Norton did not hear a second shot being fired by Mr. Murray. But when he inspected the area later, he saw two bullet casings.

[19]Id. at 141.

Actually, I noticed that he actually put the gun up to his head, and I'm trying to dial with my left hand with my cell phone because I've got my gun in my right hand, and I'm trying to dial the numbers, and -- I've thought about this a lot, and somebody actually asked me, Why didn't you just call 911? I was actually calling dispatch's number, and that's 789-4222, and I was not hitting the numbers right because I was trying to do it left-handed, and so I made like three attempts to call before it actually went through, so . . .

And like I say, he put the gun to his head. And I think I told him -- once or twice screamed, you know, Put the gun down, and then he pulled the trigger, and he just went straight down.[20]

In the meantime, before shots were fired, Deputy Byron and Trooper Young began walking through a wash.[21] Deputy Byron did not see Mr. Murray at this time, but he saw Detective Norton standing on the top of a hill approximately 400 or 500 yards away talking on a cell phone.

He then heard a crackling sound but he was not sure that it was the sound of gunfire,[22] although he did hear a report over his radio that shots had been fired. He did not see who fired the shots, but he saw a person (later identified as Mr. Murray) about 200 yards away on a flat rock outcrop below, who was swinging or waving his arms. Then Deputy Byron heard more crackling sounds and saw Mr. Murray go "from walking to going down."[23] He could no longer see Detective Norton. But he saw Mr. Murray "behind some brush and some rocks."[24] He did not know whether Mr. Murray was crouched behind the bushes or was lying on the ground. In

---

[20]Norton Dep. 146.

[21]A "wash" is a dry creek bed.

[22]Byron Dep. 97, 99.

[23]Id. at 97.

[24]Id.

his deposition, he described the situation:

> We continue a short distance.  I hear -- I hear some crackling.  I don't see Norton on the top of the hill anymore.  And it -- at some point, a guy goes -- the person goes from walking to going down.  And I see this, but his distance is a good 200-plus yards from me.  And I'm going off of memory here.  And I can -- I barely see like T-shirt or something through -- behind some bush and some rocks.

> So we -- we kind of stop.  I hear broken radio traffic of shots fired.  And it's broken, but I hear it.  I try to confirm it.  I'm looking.  I can -- I can see behind some shrubbery, some rocks, I can see that person, and I don't know if he's stooped or what, but I -- I watched him fall.  And then I don't see Vance [Norton] anymore.[25]

Deputy Byron did not see whether Mr. Murray had anything in his hands.

In the meantime, Trooper Swenson had taken Mr. Kurip into custody, and Investigator Davis had arrived at the crash scene.  At Trooper Swenson's request, Investigator Davis drove his car down a dead-end road but did not see anyone.  He drove back to the crash scene after hearing that shots had been fired and then walked to the shooting scene.

During all this time, Lieutenant Chugg had been monitoring the radio and talking with dispatch.  When he heard that shots had been fired, he left his home and drove to the crash scene.

## C.    AFTER THE SHOOTING

Deputy Byron and Trooper Young quickly returned to their cars and drove to the area where they had seen Detective Norton.  When they reached Detective Norton, he was talking on his cell phone.  Detective Norton told them that Mr. Murray had shot at him, that he had returned fire.  He also stated that he had not shot Mr. Murray but that Mr. Murray had shot himself.  Detective Norton pointed out where his bullet casings had fallen.

Deputy Byron and Trooper Young went to the place where Mr. Murray was lying on the

---

[25]Byron Dep. 97.

ground.  Trooper Young, who had his gun drawn, followed behind Deputy Byron to provide

cover.  Deputy Byron saw Mr. Murray lying on the ground, bleeding from the head but still alive

(but his breathing was labored).  Deputy Byron saw a gun on the ground next to Mr. Murray.  He

identified himself to Mr. Murray as he approached.  He did not know the extent of Mr. Murray's

injuries.  He knew that the ambulance was on stand-by (it is police procedure to call an

ambulance to stand by during a high-speed chase).  Deputy Byron rolled Mr. Murray "onto his

side, stomach" so he could put handcuffs on Mr. Murray.[26]  At the same time, Trooper Young

pointed his gun at Mr. Murray and continued to provide cover to Deputy Byron.

Deputy Byron described their actions:

> Made an approach with cover.  Trooper Young was holding cover on me.  Again,
> I didn't know what to expect.  I knew that, you know, get down, secure the scene.
> Obviously seeing that there was an injury, I didn't know where -- to what extent
> the injuries were.  I made an approach safely, and I took him into custody, placed
> him in handcuffs.[27]

Deputy Byron stated the reasons he placed Mr. Murray in handcuffs: "Again, I didn't know the

extent of his injuries, and I just wanted to make sure it was a secure scene before we got medical

on its way."[28]

In the meantime, other officers were arriving at the shooting scene.

Trooper Olsen, while driving to the scene, heard over the radio that shots had been fired.

He arrived about twenty minutes later.  He did not go to the shooting scene.  He stayed at the

crash scene, took an inventory of Mr. Kurip's car, prepared a vehicle impound report, and

---

[26]Byron Dep. 121.

[27]Id. at 127.

[28]Id. at 129.

interviewed Trooper Swenson. He did not have contact with Mr. Murray or Detective Norton at any point during the incident.

While Deputy Watkins was on his way, he learned that the car chase was over and the driver had been taken into custody. He never heard Trooper Swenson say that "two tribal males" were in the car being chased. He did know that the BIA had been called and was en route. When Deputy Watkins arrived at the crash scene, Mr. Murray had already been shot and the ambulance had been called. He helped the ambulance get close to Mr. Murray and help the EMTs load Mr. Murray into the ambulance. He then stayed at the shooting scene until an agent with the F.B.I. arrived.

Deputy Slaugh did not arrive at the shooting scene until after Mr. Murray had been shot. He went to stand by Detective Norton, where he found shell casings on the ground. He took photographs of the shell casings and Detective Norton. He and Detective Norton walked over to Mr. Murray's body. He handed Detective Norton the camera, and Detective Norton took close-up photographs of Mr. Murray. Then the two officers walked back to Deputy Slaugh's car, where they "stayed out of the scene."[29] At some point, Trooper Swenson asked Deputy Slaugh to take Mr. Kurip to a youth detention, and so Deputy Slaugh left the scene. He had no further involvement in the incident.

After Mr. Murray was handcuffed, the EMTs were summoned from the waiting ambulance. By this time, other officers had arrived. Although Mr. Murray was unconscious, breathing laboriously, and bleeding from the head, no officer at the scene tried to assist or give

---

[29]Slaugh Dep. 50.

medical aid to Mr. Murray.

About thirty minutes after the shooting, the EMTs arrived at the shooting scene. While tending to Mr. Murray, they retrieved Mr. Murray's identification card identifying him as an enrolled member of the Ute Tribe. It was only at that point that the officers knew that Mr. Murray was an enrolled member of the Ute Tribe.

When Officer Davis arrived at the shooting scene, he saw Mr. Murray, who was already on the ground and handcuffed. He stayed at the scene, but did not assist Mr. Murray. Instead, he stood over some shell casings to make sure they were not disturbed. He also assisted a Uintah County Sheriff with obtaining GPS locations. He had no further involvement with the events that day.

Deputy Watkins ordered Deputy Byron to accompany Mr. Murray to the hospital.

Lieutenant Chugg arrived at the shooting scene after Mr. Murray had been taken to the hospital.

## D.   THE HOSPITAL

Mr. Murray was taken to a hospital in Vernal, Utah, where he was pronounced dead shortly after his arrival. Deputy Byron, who had accompanied the ambulance to the hospital, was joined there by Officer Ben Murray and BIA Officer Kevin Myore. After Mr. Murray's death, the three men began collecting evidence: taking photographs of Mr. Murray's body, gathering his clothing in bags, and putting bags over Mr. Murray's hands. A member of the hospital staff drew a vial of blood from Mr. Murray's body. One of the officers took Mr. Murray's clothes and the blood. Deputy Byron placed his index finger in both of the wounds in Mr. Murray's head. According to Deputy Byron, he did this to determine the location of the entrance wound and the

13

exit wound.[30]

## E.     THE MORTUARY

An employee from a nearby mortuary took Mr. Murray's body to the mortuary.  Several

law enforcement officers—including Rex Ashdown, who was a special agent from the FBI, Gary

Jensen, who was Vernal City Chief of Police, and Keith Campbell, who was both a deputy

medical examiner for the Utah State Office of the Medical Examiner and a chief deputy for the

Uintah County Sheriff's Office—were there.

Chief Jensen twice tried, unsuccessfully, to take blood from Mr. Murray's body.   An

employee from the mortuary then made incisions in the neck and jugular vein and drew two vials

of blood which he gave to Chief Jensen.[31]  Mr. Murray's body was not embalmed.

## F.     THE MEDICAL EXAMINATION

The following day, Mr. Murray's body was taken to the Utah State Office of the Medical

Examiner.  Although FBI Special Agent Ashdown had requested that a full autopsy be

performed, the Deputy Chief Medical Examiner, Dr. Edward Leis, who was to carry out the

examination of Mr. Murray's body, decided to do only a physical examination.  According to Dr.

Leis, he decided after doing a physical examination of Mr. Murray's body and reading the Office

of the Medical Examiner (OME) Investigative Report (which said that Mr. Murray had shot

himself in the head), that a full autopsy was not necessary.

Dr. Leis determined that the bullet had entered the left side of Mr. Murray's head, to the

---

[30]Byron Dep. 155.

[31]It appears that no tests were done on either the blood drawn at the hospital or at the
morgue.

rear of the left temple and above the left ear. When he described the entrance wound in his autopsy report, Dr. Leis wrote that he found "abundant soot at the inferior margin of the defect [the wound] and some marginal abrasion is also noted at the inferior margin."[32] Because of the soot and the abrasion, Dr. Leis concluded that the gun was "in close proximity to the skin surface when it was discharged."[33] But Dr. Leis went further. He explained why he believed that the gun was in contact with Mr. Murray's head when it was fired:

> At the perimeter, there are several triangular shaped tears of the wound. That's a result of the gun being pressed up against the skin surface when it's discharged and gases causing the scalp to be separated from the underlying skull.

> When the scalp lifts up, it stretches and it tears and gets its characteristic stellae appearance.[34]

The smaller wound on the right side of Mr. Murray's head was, in Dr. Leis' opinion, the exit wound. Dr. Leis took a urine sample, an eye-fluid sample, and three blood samples from Mr. Murray's body. He sent the samples to a toxicology laboratory for testing.

Dr. Leis completed a death certificate that listed the cause of Mr. Murray's death as suicide resulting from a gunshot wound to the head.[35] Several weeks later, Dr. Leis received the results of the toxicology tests done on the fluids taken from Mr. Murray's body. The tests showed the presence of ethanol, cannabinoids, amphetamine and methamphetamine. Dr. Leis issued an amended death certificate which added "Acute alcohol intoxication; recent

---

[32](Report of Examination, Ex. 1 to Leis Dep. (Docket No. 278-13) at 3.)

[33]Leis Dep. 61.

[34]Id. at 62.

[35]As discussed below, the Plaintiffs' theory that Detective Norton shot Mr. Murray at point-blank range in an "execution-style" killing is simply not supported by the evidence.

methamphetamine use" as contributing to Mr. Murray's death.[36]

After the examination at the Medical Examiner's Office was completed, Mr. Murray's body was released to his family for burial.

## III.  ANALYSIS

### A.  Standard of Summary Judgment Review

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if it demonstrates, through pleadings, depositions, answers to interrogatories, admissions on file, or affidavits, that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c).  A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

The opposing party's response must set forth specific facts showing a genuine issue for trial, and it "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient."  Anderson, 477 U.S. at 252.  The court must view the facts in a light most favorable to the Plaintiffs.  See Lundstrom v. Romero, 616 F.3d 1108, 1118 (10th Cir. 2010);  Buck v. City of Albuquerque, 549 F.3d 1269, 1279 (10th Cir. 2008).

---

[36](Cert. of Death, Ex. 34 to Leis Dep. (Docket No. 272-10) at 2.)

**B.     Non-Conspiracy Claims Against the Individual Officers**

Under 42 U.S.C. § 1983, the Plaintiffs allege that the officers violated Mr. Murray's

Fourth Amendment and due process rights to be free from illegal seizure, excessive force, and

the officers' failure to intervene in ongoing violations of those civil rights.  Under 42 U.S.C.

§ 1985, they allege that the Defendants conspired to obstruct justice in a state court proceeding

and to violate equal protection rights, all while motivated by a racial animus directed at Native

Americans.

**1.     Qualified Immunity**

Law enforcement officers who have been sued in their individual capacity for

constitutional violations are entitled to qualified immunity "when they could not reasonably have

known that their challenged actions violated the law."  Ross v. Neff, 905 F.2d 1349, 1354 (10th

Cir. 1990).  Qualified immunity "provides 'immunity from suit rather than a mere defense to

liability.'"  Mecham v. Frazier, 500 F.3d 1200, 1203 (10th Cir. 2007) (quoting Mitchell v.

Forsyth, 472 U.S. 511, 526 (1985)).

The doctrine shields law enforcement officers from civil liability for discretionary actions

if "their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982);[37] see

also Powell v. Mikulecky, 891 F.2d 1454, 1457 (10th Cir. 1989) (same); Pueblo Neighborhood

Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1988) (same).  Only after the plaintiffs

satisfy their burden do the officers "assume the normal burden of a movant for summary

---

[37]The court may choose the order in which to analyze the "clearly established" and "constitutional violation" issues.  Pearson v. Callahan, 555 U.S. 223 (2009).

judgment of establishing that no material facts remain in dispute that would defeat . . . his claim of qualified immunity." <u>Powell</u>, 891 F.2d at 1457.

### 2. Law Enforcement Jurisdiction

Law enforcement jurisdiction on the Reservation is an important element of the Plaintiffs' case. Apart from some limited exceptions discussed below, neither the State of Utah nor its political subdivisions have criminal jurisdiction in "Indian country," such as the Reservation. <u>See</u> 18 U.S.C. § 1152 (federal law of the United States "as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States . . . shall extend to Indian country."); <u>Gardner v. United States</u>, No. 93-4102, 1994 U.S. App. LEXIS 10090 at *10 (10th Cir. May 5, 1994). Although a cooperative law enforcement agreement between a state and a tribe may allow cross-deputized officers from Utah to exercise law enforcement authority on the Reservation, none of the officers involved in this incident were cross-deputized.

Any seizure of Mr. Murray by any of the Individual Defendants, absent exigent circumstances, would as a matter of law be unconstitutional. <u>See Ross v. Neff</u>, 905 F.2d 1349, 1354 (10th Cir. 1990) (a "warrantless arrest executed outside of the arresting officer's jurisdiction [that is, on tribal land] is analogous to a warrantless arrest without probable cause" and is "presumptively unreasonable."). The court has already held that no exigent circumstances existed in this case.[38] Accordingly, based on <u>Ross</u>, any seizure of Mr. Murray on the Reservation

---

[38](<u>See</u> July 26, 2010 Mem. Decision & Order (Docket No. 73) at 6 (holding that Detective Norton did not have jurisdiction to seize Mr. Murray on the Reservation because the officers were not in hot pursuit of Mr. Murray).)

by the officers was unreasonable as a matter of law.[39]

### 3. Claims of Illegal Seizure

The Plaintiffs contend that officers Norton, Young, Byron, and Swenson seized Mr. Murray on the Reservation[40] and so a violation of Mr. Murray's Fourth Amendment rights necessarily occurred. They focus on the following events: (1) Trooper Swenson's order to Mr. Kurip and Mr. Murray to stop after the car chase ended and the men got out of the car; (2) the forming of a police perimeter to entrap Mr. Murray;[41] (3) Detective Norton firing at Mr. Murray twice; (4) when Detective Norton's bullet allegedly entered Mr. Murray's head; and (5) Deputy Byron handcuffing Mr. Murray while Trooper Young pointed his gun as cover for Deputy Byron.

"Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968) (emphasis added), quoted in Reeves v. Churchich, 484 F.3d 1244, 1251 (10th Cir. 2007). Plaintiffs allege that Mr. Murray was illegally seized either through a "show of authority"[42] or physical force multiple times during the pursuit. As discussed below, the case law and facts do not support the Plaintiffs' allegations.

---

[39]Plaintiffs also maintain that the officers had no probable cause to seize Mr. Murray. Given the court's jurisdiction ruling, the court need not address the issue of probable cause.

[40]There is no genuine dispute that the crash, foot pursuit, and shooting occurred on the Reservation.

[41]A police perimeter is a tactic used by law enforcement to surround a suspect and prevent the suspect from leaving the area.

[42]A "show of authority" occurs when the plaintiff is not physically touched. Reeves, 484 F.3d at 1252.

a.     Trooper Swenson's Verbal Command to Stop

Plaintiffs assert that Trooper Swenson seized Mr. Murray when he ordered the two men to stop after Mr. Kurip ran the car off the road.  Even though the two men were not physically restrained at that point, the Plaintiffs argue that the two men were seized by a show of authority when, after Trooper Swenson shouted to them to stop, Mr. Kurip and Mr. Murray hesitated before running away.  Characterizing the incident as a "traffic stop,"[43] they argue that the hesitation was a submission to Trooper Swenson's command and, consequently, a seizure occurred.

In California v. Hodari D., the United States Supreme Court defined the contours of the "show of authority" requirement.  499 U.S. 621 (1991), cited in Reeves, 484 F.3d at 1252.  In Hodari D., the Court held that a police officer's command to halt is not a seizure until the person actually submits to the command.  Id. at 626.  There, the Court held that because the suspect fled and refused to comply with the police command to stop, he was not seized at that point.  Id. at 629.  A number of cases in the Tenth Circuit address the same issue and reach the same conclusion.  See, e.g., Brooks v. Gaenzle, 614 F.3d 1213, 1219 (10th Cir. 2010) (noting that "one can reasonably conclude a 'seizure' requires restraint of one's freedom of movement and includes apprehension or capture by deadly force.");  Reeves v. Churchich, 484 F.3d 1244, 1251-53 (10th Cir. 2007) (holding that plaintiffs were not seized when gun was pointed at them because they pushed the gun away and ignored the officers' commands); United States v. Harris, 313 F.3d 1228, 1234-35 (10th Cir. 2002) (holding that plaintiff was not seized because he

---

[43](Pls.' Mot. Partial Summ. J. (Docket No. 273) at 16.)

ignored the officer's request to produce identification and continued walking even when the officer followed him); Bella v. Chamberlain, 24 F.3d 1251, 1256 (10th Cir. 1994) (holding that officer's firing of gun shots that struck fleeing helicopter was an assertion of authority but that no seizure occurred because the shots did not cause the suspect to submit and or otherwise succeed in stopping the suspect).

The video taken by the dashboard camera on Trooper Swenson's patrol car captured the scene of the car stopping and Mr. Murray getting out of the car and running away from the officer. Plaintiffs suggest that Mr. Murray, upon getting out of the car, hesitated and glanced to the left toward Mr. Kurip as Trooper Swenson ordered them to stop. This hesitation, Plaintiffs assert, was a brief submission to Trooper Swenson's authority and constituted a seizure of, admittedly, "short duration."[44] But the video does not support the Plaintiffs' characterization of the events.[45] They describe the incident through a play-by-play recitation of what Trooper Swenson remembered and articulated in his deposition.[46] But the events happened much faster than Plaintiffs suggest. That is clear from the dash-cam video taken from Trooper Swenson's car. Having reviewed the video, the court finds that Mr. Murray's glance to the left as he fled on foot, to the extent it was a "hesitation," was so slight that no reasonable jury could interpret it as a submission to Trooper Swenson's commands.[47]

_____

[44](Pls.' Mot. Partial Summ. J. (Docket No. 273) at 16.)

[45](See Trooper Swenson Dash Cam Video Excerpts, Ex. H to State Defs.' Mem. Opp'n (Docket No. 311) at 11:20:31.)

[46](See Pls.' Mot. Partial Summ. J. (Docket No. 273) at pp. 5-6, ¶¶ 8-12.)

[47]Anything depicted on a videotape of the incident that contradicts and makes unbelievable the plaintiff's characterization of the incident overrides conflicting testimony. See

With no submission, Plaintiffs cannot establish that Mr. Murray was seized by Trooper Swenson. Accordingly, Trooper Swenson is entitled to qualified immunity as a matter of fact on Plaintiffs' claim of illegal seizure.

b.  Police Perimeter[48]

Plaintiffs next allege that Trooper Swenson, Detective Norton, Deputy Byron, and Trooper Young acted in concert to "erect[] a police perimeter to entrap Murray" when they "fanned out on foot," "began searching for Murray with guns drawn, including three handguns, an AR-15 rifle, and a shotgun," and "clos[ed] in on him."[49] But, the Individual Defendants contend, no police perimeter was formed, and even if one was formed, it was not a seizure. The

_____

Scott v. Harris, 550 U.S. 372, 380 (2007) (noting that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by [a videotape in] the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

[48]The Plaintiffs, in their seizure analysis, treat the perimeter, shooting, and handcuffing events as one continuous action. But each officer, to the extent liability exists, is only responsible for his own actions. "[A]n allegation that Defendant A violated a plaintiff's clearly established rights does nothing to overcome Defendant B's assertion of qualified immunity, absent some allegation that Defendant B was responsible for Defendant A's conduct." Dodds v. Richardson, 614 F.3d 1185, 1194 (10th Cir. 2010); see also Pahls v. Thomas, 718 F.3d 1210, 1233 (10th Cir. 2013) ("Liability under § 1983 and Bivens, and defendants' entitlement to qualified immunity, turn on an individual assessment of each defendant's conduct and culpability."); Foote v. Spiegel, 118 F.3d 1416, 1423-24 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."); Auvaa v. City of Taylorsville, 506 F. Supp. 2d 903, 910 (D. Utah 2007) ("A § 1983 plaintiff must show an affirmative link between a defendant's conduct and a constitutional violation[.]"). Accordingly, the court analyzes the police perimeter allegation separately because not every officer who formed the alleged perimeter shot at Mr. Murray or was involved in the handcuffing of Mr. Murray. See Bella v. Chamberlain, 24 F.3d 1251, 1256 (10th Cir. 1994) ("We do not look to events that occurred approximately one hour *prior* to Mr. Bella's actual seizure to determine if the seizure was reasonable. 'A seizure is a single act, and not a continuous fact.'") (emphasis in original) (quoting California v. Hodari D., 499 U.S. 621, 625 (1991)).

[49](Pls.' Mot. Partial Summ. J. (Docket No. 273) at 19.)

court agrees.

After Mr. Murray fled, Trooper Swenson captured Mr. Kurip, handcuffed him, and brought him back to the police car at the crash scene.[50]  As Detective Norton, Deputy Byron and Trooper Young each arrived at the crash scene, Trooper Swenson asked them to apprehend Mr. Murray.  The three officers, all of whom were armed, pursued Mr. Murray on foot.

But Trooper Swenson never left the scene of the crash.  He stayed with Mr. Kurip.  His only role in the foot chase was to ask officers from different law enforcement jurisdictions to chase and capture Mr. Murray.  Trooper Swenson had no involvement in formation of the alleged perimeter.  And even if one characterizes his request to the officers to pursue Mr. Murray as a command to form a perimeter,[51] he still has no liability because, as discussed below, the formation of any such perimeter did not seize Mr. Murray.

Indeed, the court is not convinced from the record that a reasonable jury could conclude that the three officers actually formed a perimeter that surrounded Mr. Murray and prevented his escape.  The officers were one to two hundred yards away from Mr. Murray and did not have him surrounded.  They were coming at him from the same direction, and, with the exception of Detective Norton, the officers did not definitively locate Mr. Murray until after the shooting.

---

[50]Only at that time did Trooper Swenson determine that Mr. Kurip was not a tribal member.  The seizure of Mr. Kurip was jurisdictionally valid.  That fact was confirmed after the arrest, when Trooper Swenson had the opportunity to make that determination.

[51]An officer whose order sets in motion a series of events that violate the suspect's rights may be liable under § 1983.  This "indirect participation" liability has been recognized by the Tenth Circuit.  See, e.g., Buck v. City of Albuquerque, 549 F.3d 1269, 1279-80 (10th Cir. 2008) ("The requisite causal connection [for indirect liability] is satisfied if the [officer] set in motion a series of events that the [officer] knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights.").

Deputy Byron's view of Mr. Murray was partially obscured by a bush and his sighting of Mr. Murray occurred within seconds of Mr. Murray being shot. Trooper Young did not see Mr. Murray until after Mr. Murray had been shot.

But even if they did form a perimeter, the record is not clear that Mr. Murray would have been aware of a police perimeter or would have had the knowledge that a group of police officers were pursuing him. As a group, they did not identify themselves to him. The only officer clearly visible to Mr. Murray was Detective Norton, and the presence of one officer does not form a perimeter.[52]

But even assuming the officers formed a police perimeter around Mr. Murray, they did not seize him, because Mr. Murray failed to submit to their law enforcement authority. Instead of submitting, Mr. Murray fired a shot at Detective Norton and then turned the gun on himself. See Reeves v. Churchich, 484 F.3d 1244, 1252-53 (10th Cir. 2007) (no seizure occurred when police officers gave verbal commands and pointed their weapons at the plaintiffs outside a surrounded apartment building, because one plaintiff ran away and the other pushed the gun away, refusing to follow the officer's command to go inside her apartment); Estate of Bennett v. Wainwright, 548 F.3d 155, 171 (1st Cir. 2008) (holding that existence of police perimeter was not a seizure because there was no evidence that the suspect knew his house had been cordoned off, much less that he submitted to the officers' authority).

----

[52]If a suspect is not aware of the presence of the officers, there would be no show of authority to which he could submit. See Estate of Bennett v. Wainwright, 548 F.3d 155, 171 (1st Cir. 2008) (holding that existence of police perimeter was not a seizure because there was no evidence that the suspect knew his house had been cordoned off, much less that he submitted to the officers' authority). We will never know what Mr. Murray knew at the time he died.

Because no reasonable jury could find that Mr. Murray submitted to a police perimeter, the court holds that no constitutional violation occurred. Trooper Swenson, Detective Norton, Deputy Byron, and Trooper Young are entitled to qualified immunity from suit on that portion of Plaintiffs' claim.

### c. Detective Norton's Shooting at Mr. Murray

The Plaintiffs contend that Detective Norton seized Mr. Murray when he (1) fired shots at Mr. Murray; and (2) according to Plaintiffs, shot Mr. Murray in the head. The record does not support their claim and no reasonable jury could find against Detective Norton.

During the foot chase, when Detective Norton spotted Mr. Murray approximately 100 yards away, he held his gun (a .40 caliber weapon) in a "low ready position,"[53] identified himself as a police officer, and ordered Mr. Murray to get down on the ground. In response, Mr. Murray fired two shots at Detective Norton, both of which hit the ground by Detective Norton. In return, Detective Norton fired two shots at Mr. Murray as he tried to distance himself from Mr. Murray by retreating back up the hill. Those shots also fell short of the target. Then Detective Norton saw Mr. Murray put a gun to his head, shoot himself, and drop to the ground. The gun found on the ground by Mr. Murray was a .380 handgun.

---

[53]Holding a gun in the "low ready position" means holding the gun with both hands, arms straight, in a position below the target level. According to Detective Norton, when he saw Mr. Murray, he was not pointing his gun at Mr. Murray, but rather held his gun in a "low ready [position] to where it's down to where you actually can observe what's going on so your gun's not in your way." (Norton Dep. 142.)

**Shots Fired**

As noted above, a seizure occurs when the individual is physically restrained by the officer or when the individual submits to the officer's show of authority. Reeves v. Churchich, 484 F.3d 1244, 1251 (10th Cir. 2007). Neither scenario occurred here. When Detective Norton identified himself as a police officer and told Mr. Murray to get to the ground, Murray resisted by firing two shots at Detective Norton. When Detective Norton responded by shooting back at Mr. Murray, his bullets hit the ground around Mr. Murray. Because Mr. Murray resisted Detective Norton's order and because Detective Norton's bullets missed the target (Mr. Murray), Detective Norton did not seize Mr. Murray at that point. See, e.g., James v. Chavez, 830 F. Supp. 2d 1208, 1242-43 (D.N.M. 2011) (holding that a shot that misses the intended target is not a seizure) (citing to Reeves, 484 F.3d at 1252-53).

Plaintiffs contend Mr. Murray was waving his arms in an act of surrender and so he did submit to Norton's show of authority. But the evidence on that point is inconclusive, and, more importantly, not material. The evidence clearly shows that Mr. Murray shot himself.

**The Bullet to Mr. Murray's Head**

The Plaintiffs argue that Detective Norton seized Mr. Murray because he shot Mr. Murray in the head. But the Plaintiffs' evidence is sparse, circumstantial, subject to more than one interpretation, and, at times, very speculative. Moreover, evidence to the contrary is strong and is consistent with a self-inflicted gunshot wound.

Deputy Byron testified that he did not see Detective Norton next to Mr. Murray when Mr. Murray dropped to the ground. Detective Norton testified that he was up on a hill when he saw

Mr. Murray shoot himself.[54]

The Deputy Chief Medical Examiner Dr. Edward Leis, who conducted the physical examination of Mr. Murray's body, concluded in his report that the wound was caused by a gun shot "in close proximity to the skin surface when it was discharged."[55]  He based his conclusion on "abundant soot at the inferior margin of the defect [the wound] and some marginal abrasion is also noted at the inferior margin."[56]  In his testimony, he elaborated on his conclusion that the gun was in contact with Mr. Murray's head when it was fired:

> At the perimeter, there are several triangular shaped tears of the wound.  That's a result of the gun being pressed up against the skin surface when it's discharged and gases causing the scalp to be separated from the underlying skull.
>
> When the scalp lifts up, it stretches and it tears and gets its characteristic stellae appearance.[57]

The smaller wound on the right side of Mr. Murray's head was, in Dr. Leis' opinion, the exit wound.[58]  After Dr. Leis certified that Mr. Murray's death was a suicide resulting from a gunshot wound to the head, he added an additional cause of death (based on results from testing of Mr.

---

[54]As discussed below, contrary to Plaintiffs' allegations, there are no inconsistencies between Deputy Byron's version of events and Detective Norton's version.

[55]Leis Dep. 61.

[56](Report of Examination, Ex. 1 to Leis Dep. (Docket No. 278-13) at 3.)

[57]Leis Dep. 62.

[58]Plaintiffs note that Mr. Murray was right-handed, which, they say, is inconsistent with a finding that the entrance wound was on the left side of the head.  But Dr. Leis testified that the location of the entrance wound, the trajectory of the bullet, and the location of the exit wound would be consistent with Mr. Murray putting the gun in his right hand to the left side of his head and pulling the trigger.  (Leis Dep. 129-30 (quoting from his Report that "[t]he projectile path is left to right, upward, and slightly front to back.").)

Murray's bodily fluids). Because the tests showed the presence of drugs and alcohol in Mr. Murray's system, Dr. Leis issued an amended death certificate which added "Acute alcohol intoxication; recent methamphetamine use" as contributing to Mr. Murray's death.[59]

Detective Norton was more than 100 yards away when Mr. Murray was shot. Dr. Leis testified that there was no evidence that the wound could have been caused by a shot coming from that far away.[60] Plaintiffs maintain that Detective Norton was not 100 yards away, but was right next to Mr. Murray and so he had the capability of inflicting the contact wound. But the actual evidence in the record (that is, testimony by Detective Norton and Deputy Byron) shows that Detective Norton was not right next to Mr. Murray when the fatal shot was fired.

The Plaintiffs' alternative contention that Mr. Murray shot himself in response to the pressure of a wrongful pursuit is not persuasive. Their theory is speculative. Moreover, such a situation would not be a seizure. See Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989) ("[A] Fourth Amendment seizure does not occur whenever there is . . . a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is governmental termination of freedom of movement *through means intentionally applied*.") (italics emphasis in original; underline emphasis added). Based on the evidence in the record, no reasonable jury could find that Detective Norton inflicted the mortal blow to Mr. Murray.

Plaintiffs contend that Detective Norton shot Mr. Murray in the head at point blank range, but they offer speculation rather than evidence to support their claim. For instance, they point to

---

[59](Cert. of Death, Ex. 34 to Leis Dep. (Docket No. 272-10) at 2.)

[60]Leis Dep. 124.

Dr. Leis' response (in his deposition) to a question that asked for an answer to a hypothetical. Specifically, the attorney asked, "So would it be possible – is it your opinion, Doctor, that this could be – looking at this wound [as depicted in a photograph], that it could be self-inflicted or an execution-style shooting?"[61]  After an objection, the attorney then asked, "Can you tell from this entrance wound, Dr. Leis, whether or not this was conclusively caused by a self-inflicted gunshot wound or an execution-style killing?"[62]  Dr. Leis said, "No."[63]  But Dr. Leis was asked by Plaintiffs' counsel whether he could conclusively say, based solely on examining the entrance wound with no other evidence to provide context, that the wound was caused by a self-inflicted gun shot wound rather than an execution-style killing.  Furthermore, Dr. Leis' answer based on the hypothetical offered to him is not supported by the facts in the record.  Indeed, Dr. Leis, based on his examination of Mr. Murray and the data he gathered from tests of body fluids, opined that Mr. Murray had shot himself in the head.  All of the direct evidence presented by the Defendants, including Dr. Leis' testimony and report, supports the conclusion that Mr. Murray shot himself.  Plaintiffs offer no more than speculation and no reasonable jury could find that Detective Norton shot Mr. Murray in the head at point-blank range.

The Plaintiffs question Detective Norton's version of the events that occurred.  But veracity of a witness is not to be considered at the summary judgment stage.  Moreover, independent evidence discussed above supports Detective Norton's version of events.  It is much more reasonable to infer that Mr. Murray's acute intoxication rendered him irrational and that he

---

[61]Leis Dep. 64.

[62]Id. at 64-65.

[63]Id. at 65.

pulled the trigger. Under all of the circumstances, no reasonable jury could accept the Plaintiffs'
theory about an execution-style killing.

Because direct evidence (unrefuted by admissible evidence) that Mr. Murray's gunshot
wound was self-inflicted, it could not be a physical restraint imposed by Detective Norton.
Consequently, the fatal shot was not a seizure by a law enforcement officer.

For foregoing reasons, no reasonable jury could conclude that a seizure of Mr. Murray
occurred during the shooting incident, and so his constitutional right to be free from illegal
seizures was not violated. Detective Norton is entitled to qualified immunity on the seizure
claim.

       d.       <u>Handcuffing of Mr. Murray at the Shooting Scene</u>

**Deputy Byron**

Deputy Byron's handcuffing of Mr. Murray was indisputably a seizure. Because that
seizure occurred on the Reservation, where Mr. Murray was an enrolled member of the Ute
Tribe, and because Deputy Byron was not cross-deputized, that seizure was a *per se* violation of
Mr. Murray's Fourth Amendment right, albeit a technical violation. See <u>Ross v. Neff</u>, 905 F.2d
1349, 1353-54 (10th Cir. 1990) (holding that a warrantless arrest made outside of the officer's
jurisdiction is a constitutional violation absent exigent circumstances).

Consequently, the court must determine whether Deputy Byron violated a clearly
established constitutional right of which a reasonable officer would have known. In other words,
to determine whether the officers are entitled to the qualified immunity defense, the court "must
determine whether a reasonable officer could have believed the manner of plaintiff's arrest and
detention . . . to be constitutionally permissible, in light of clearly established law <u>and the</u>

30

information defendants possessed at the time."  <u>Martin v. Bd. of County Comm'rs</u>, 909 F.2d 402, 405 (10th Cir. 1990) (emphasis added).

Even if the rule of law regarding an officer's jurisdiction was clearly established in <u>Ross</u>, that decision did not address how or when a police officer must determine the tribal status of the suspect.  Deputy Byron did not know Mr. Murray and he did not hear any reference to "tribal males" over the radio.  When Deputy Byron handcuffed Mr. Murray, at that point there was no way he could determine whether Mr. Murray was a tribal member.  He followed reasonable police procedure, and there is no legal rule prohibiting the procedure he followed.

Moreover, an officer cannot tell whether a person is a registered tribal member just by looking at him.[64]  The officer needs official verification, which may or may not be in possession of the suspect.  "It is the policy and practice of the State Defendants and the law enforcement agencies working near the reservation to stop individuals suspected of wrongdoing, and *then* determine whether the suspect is a registered member of a tribe."[65]

Deputy Byron confirmed this practice when he testified that his employer's policy was to handle situations requiring a quick response without regard to jurisdiction because the officers must provide assistance to whomever needs it without having to verify first whether the suspect was a member of the Ute Tribe.

Deputy Byron reasonably believed that he had a factual basis to restrain Mr. Murray.  It is not reasonable to expect him to ascertain Mr. Murray's status before then.

---

[64]The court notes that Mr. Kurip was originally identified as a "tribal male" even though he was not.

[65](State Defs.' Mem. Opp'n (Docket No. 310) at 22 (citing Swenson Dep. at 28; Chugg Dep. at 27-31, 161; Byron Dep. at 25-26) (emphasis in original).)

**Trooper Young**

Plaintiffs also contend that Trooper Young violated Mr. Murray's civil rights by pointing a gun at him. Trooper Young did not touch Mr. Murray and did not point his gun at Murray for longer than the time it took for Deputy Byron to approach Mr. Murray and handcuff him. Trooper Young did not make a show of authority to Mr. Murray, as Mr. Murray was unconscious and had no knowledge of the cover Trooper Young provided for Deputy Byron. Pointing a gun at a suspect, by itself, with no submission by the suspect, is not a seizure. See Reeves v. Churchich, 484 F.3d 1244, 1252-53 (10th Cir. 2007) (finding no seizure when officers pointed weapons and made verbal commands without submission to authority); James v. Chavez, 830 F. Supp. 2d 1208, 1243 (D.N.M. 2011) ("[W]ithout evidence that a person has submitted to a show of authority, even an officer pointing a gun directly at a person's head does not constitute a seizure.") (citing Reeves, 484 F.3d at 1252-53). To the extent the Plaintiffs contend that Trooper Young's action was a seizure because it was connected to (or perhaps facilitated by) Deputy Byron's action, their claim fails, because, as discussed above, it was reasonable for Trooper Young to protect his fellow officer, whether the danger was real or not. He too had no reasonable basis for knowing that Mr. Murray was an enrolled member of the Tribe. An officer is not required to determine a person's legal status before doing his duty to enforce the law in a situation requiring a quick response. For the foregoing reasons, the court finds that Trooper Young did not violate Mr. Murray's civil rights by pointing a gun at Mr. Murray and so he is entitled to qualified immunity on the seizure claim.

### 4. Claims of Excessive Force

The Plaintiffs contend that the officers used excessive force against Mr. Murray when they (1) formed the "police perimeter to entrap and apprehend Murray at gunpoint";[66] (2) ordered Mr. Murray at gun point to get down on the ground; and (3) used deadly force to apprehend Mr. Murray (that is, when Detective Norton shot at Mr. Murray and then allegedly shot Mr. Murray in the head). Additionally, although it is not clearly laid out in the pleadings, it appears that the Plaintiffs also contend that Deputy Byron used excessive force when he handcuffed Mr. Murray.

The Plaintiffs bring their excessive force claim under the Fourth Amendment as well as the substantive due process clause of the Fourteenth Amendment. A claim of excessive force occurring during a seizure must be analyzed under the Fourth Amendment reasonableness test set forth in Graham v. Connor, 490 U.S. 386 (1989). United States v. Lanier, 520 U.S. 259, 272 n.7 (1997). A claim of excessive force that occurs outside the course of a seizure is analyzed under the Fourteenth Amendment's substantive due process principles. County of Sacramento v. Lewis, 532 U.S. 833, 843-44 (1998).

Because the Plaintiffs challenge acts that occurred in both seizure and non-seizure circumstances, the court will analyze the claims of excessive force under both standards, as applicable. But, regardless of the standard that applies, no reasonable jury could find that any of the officers used excessive force on Mr. Murray.

---

[66](Pls.' Mot. Partial Summ. J. (Docket No. 273) at 21.)

33

a.  Excessive Force Claims Under the Fourth Amendment

To find excessive force under the Fourth Amendment, the court must first find that a seizure occurred.  County of Sacramento v. Lewis, 523 U.S. 833, 843-44 (1998); Graham v. Connor, 490 U.S. 386, 394 (1989).  The only time Mr. Murray was seized was when Deputy Byron handcuffed him.  Accordingly, that is the only act that must be analyzed under the standards applicable to the Fourth Amendment claim.

To determine whether Deputy Byron used excessive force, the court must consider the totality of the circumstances and conduct "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Graham, 490 U.S. at 396 (internal citations and quotation marks omitted).

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Id. at 396-97.  "The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances."  Muehler v. Mena, 544 U.S. 93, 103 (2005) (Kennedy, J. concurring).

Here, Deputy Byron did not know the identity of Mr. Murray or anything about him other than his involvement in the high-speed chase, his flight from a police officer, subsequent exchange of gun shots, and a gun on the ground next to Mr. Murray.  He rushed onto the scene and had little time to assess the situation before he handcuffed Mr. Murray.  He knew he had a

wounded suspect and that emergency personnel were on the way. He secured the scene, as he was trained to do. Securing the scene, no matter what it might present, is a reasonable response by a police officer.

Moreover, to succeed on a claim of excessive force for the manner of handcuffing, a plaintiff "must show 'some actual injury that is not de minimis, be it physical or emotional.'" Koch v. City of Del City, 660 F.3d 1228, 1247 (10th Cir. 2011) (quoting Cortez v. McCauley, 478 F.3d 1108, 1129 (10th Cir. 2007)). There is no evidence of physical harm or emotional harm to Mr. Murray. The manner in which Deputy Byron handcuffed Mr. Murray was simple and the least intrusive way to secure the scene for the EMTs.

      b.     Excessive Force Claims Under the Substantive Due Process Clause

Plaintiffs alternatively claim that Mr. Murray's substantive due process rights under the Fourteenth Amendment were violated. The due process analysis under the Fourteenth Amendment applies to a claim of excessive force only when no seizure occurred. See County of Sacramento v. Lewis, 523 U.S. 833, 842-43 (1998) (holding that all claims of excessive force arising out an arrest, investigatory stop, or other seizure should be analyzed under the Fourth Amendment, and that the substantive due process analysis applies only when the claim is not covered by the Fourth Amendment); United States v. Lanier, 520 U.S. 259, 272 n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); Becker v. Kroll, 494 F.3d 904, 922 (10th Cir. 2007) (noting that substantive due process analysis is foreclosed if claim is covered by the Fourth Amendment). Because neither the pursuit of Mr. Murray on Reservation land nor

Detective Norton's shot at Mr. Murray resulted in a seizure, the court analyzes the Plaintiffs' claims on those events by applying the substantive due process standard.

"[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" County of Sacramento, 523 U.S. at 847 (quoting Collins v. Harker Heights, 503 U.S. 115, 128 (1992)). And "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" Collins, 503 U.S. at 129. The substantive due process standard is "more onerous" than the Fourth Amendment standard. Butler v. City of Norman, 992 F.2d 1053, 1054 (10th Cir. 1993)). Plaintiffs have not met this high threshold.

All of the Plaintiffs' claims of egregious behavior stem from their complaint that the actions took place on the Reservation and were aimed at an enrolled member of the tribe. The officers did not know, could not have known, and did not have the duty at that point to ascertain whether Mr. Murray was an enrolled member of the tribe.

The pursuit was reasonable under the circumstances. Mr. Murray was part of a high speed chase and fled from Trooper Swenson. This information created sufficient concern in the officers' minds about Mr. Murray's motives for the flight and the danger he posed, if any. They reasonably believed he had committed at least one crime (flight from a police officer) and pursuing him for that was reasonable. Even though the BIA police had been called as a precaution, no BIA police officer was there at the time. It was completely reasonable to apprehend the fleeing suspect so they could fully investigate and turn him over to the proper authorities, if necessary. There is no evidence that the officers were acting like a posse to capture the "Indian," as Plaintiffs have argued. Although Plaintiffs paint it that way, they do so without

36

evidence to support their theory.

It was also reasonable under the circumstances for Detective Norton to fire his gun at Mr. Murray. Mr. Murray shot at Detective Norton first. Detective Norton was retreating to protect himself when he shot back.

None of the officers' actions were egregious or conscience shocking. Their attempt to apprehend Mr. Murray while protecting themselves—and the means they used to do so—were expected police behavior in light of the circumstances.

## 5. Claims of Failure to Intervene

It is clearly established that every law enforcement officer has the duty to intervene if he sees a person's constitutional rights being violated by a fellow officer and has an opportunity to do so. Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008). "'Omissions as well as actions may violate civil rights'" and "'under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983.'" Lanigan v. Village of East Hazel Crest, 110 F.3d 467, 477 (7th Cir. 1997) (quoting Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994)). An officer is liable under § 1983 for failure to intervene if he knows a constitutional violation is being committed and he had a "realistic opportunity to intervene to prevent the harm from occurring." Id. at 477.

Plaintiffs allege that the Individual Defendants failed in their duty to intervene to protect the constitutional rights of Mr. Murray. Specifically, they allege in their complaint that each of the Individual Defendants failed to intervene because they breached their "duty to protest" the "illegal pursuit and apprehension" of Todd Murray on the Reservation.

Each [Individual] Defendant had a duty to protest to his fellow officers that each

37

of them was <u>outside their jurisdictional authority and was without any legal authority to pursue Murray</u> on the tribal trust lands of the Uintah and Ouray Reservation.[67]

The Plaintiffs further allege that:

> each of the [Individual] Defendants had a <u>duty to protest</u> to his fellow police officers that there existed <u>neither reasonable suspicion nor probable cause</u> to believe that Todd R. Murray had committed any crime, meaning that the officers' pursuit of Murray—at gunpoint—was illegal on multiple Constitutional grounds.[68]

It appears from the Plaintiffs' complaint that they focus the majority of their "failure to intervene" allegations on the pursuit of Mr. Murray. But based on their statements in briefs, the court liberally reads their pleadings and concludes that they also challenge the officers' actions concerning the handcuffing of Mr. Murray. Accordingly, the court will look at the events that occurred at the shooting scene after Mr. Murray was shot.[69]

---

[67](Pls.' Third Am. Compl. (Docket No. 170) at ¶ 124 (emphasis added).)

[68](Pls.' Third Am. Compl. (Docket No. 170) at ¶ 125 (emphasis added).)

[69]Plaintiffs argue that Deputy Watkins' order to Deputy Byron to accompany Mr. Murray to the hospital and then to the mortuary set in motion a series of events that violated Mr. Murray's rights–namely, "improperly put[ting] his fingers in the wound on Murray's head while Murray's body was at the hospital." (Pls.' Mem. Opp'n to Watkins' Mot. Summ. J. (Docket No. 327) at 12.) This is not a "failure to intervene" claim. It is a supervisory liability claim. Although a supervisor may not be held vicariously liable for the acts of a subordinate, he may be personally liable if he had personal involvement, the supervisor's act set in motion a series of events that caused the constitutional violation, and that the supervisor had the requisite state of mind. <u>Schneider v. City of Grand Junction Police Dep't</u>, 717 F.3d 760, 767 (10th Cir. 2013). Plaintiffs apparently claim that Deputy Watkins directly caused Mr. Murray's civil rights to be violated by ordering Deputy Byron to stay with the body at the hospital and mortuary, and so he is directly involved in the alleged act violating the rights. Deputy Watkins was not present at the hospital or mortuary. And there is no evidence that Deputy Watkins ordered Deputy Byron to touch Mr. Murray. Nor do the Plaintiffs cite any case law supporting their contention that what Deputy Byron did violated a civil right. To the extent Deputy Watkins set in motion Deputy Byron's acts at the hospital (that is, placing his finger in the hole in Mr. Murray's head ), such an act could not have been anticipated. Moreover, Mr. Murray was dead by then and, consequently, did not have any constitutional rights to be violated. <u>See</u> <u>Dohaish v. Tooley</u>, 650 F.2d 934, 936

To find liability, the court must find that a duty to intervene exists and that the officer had an opportunity to intervene. But there can be no failure to intervene if a constitutional right has not been violated. See, e.g., Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]"); Gossmeyer v. McDonald, 128 F.3d 481, 494 (7th Cir. 1997) (no constitutional violation and so no liability for failure to intervene), cited in Ford v. Fleming, 229 F.3d 1163, 2000 WL 1346392, at *2 (10th Cir. Sept. 19, 2000) (unpublished table case). The pursuit of Mr. Murray, both by car and on foot, did not constitute a violation, so the court need not determine whether there was a failure to intervene. See Carter v. Buscher, 973 F.2d 1328, 1332 (7th Cir. 1992) (stating that "pre-seizure conduct is not subject to Fourth Amendment scrutiny").

As the court found above, the pursuit did not constitute a seizure (it did not result in submission to a show of authority or physical restraint of Mr. Murray). Second, pursuing Mr. Murray on Reservation lands after a high-speed car chase is not a violation of Mr. Murray's rights because he was not seized and there was no reason for the police officers to know that Mr. Murray was an enrolled member of the tribe. Compare Ross v. Neff, 905 F.2d 1349, 1354 n.6 (10th Cir. 1990) (addressing an arrest (seizure) of a tribal member on Indian land, not pre-seizure conduct). Third, when Deputy Byron handcuffed Mr. Murray, neither Deputy Byron nor Trooper Young had any basis for knowing that Mr. Murray was an enrolled member of the Tribe. The

_____

(10th Cir. 1982) (civil rights are personal and do not survive the person's death). As troublesome as Deputy Byron's action is, Deputy Watkins is not liable for his own actions or the actions of Deputy Byron.

same would apply to any other officer on the scene, either at the time of the handcuffing or immediately afterward. The handcuffing had already occurred by the time the officers arrived at the site. Accordingly, they did not have the ability to stop the handcuffing. Also, none of the officers had any basis for knowing that Mr. Murray was an enrolled member of the Tribe, and so they would not reasonably have known that a violation of the right recognized in <u>Ross v. Neff</u> had occurred.

## C.  <u>Conspiracy Claims Under 42 U.S.C. § 1985</u>

Plaintiffs bring their ninth and tenth causes of action in civil conspiracy under 42 U.S.C. § 1985(2) and 42 U.S.C. § 1985(3) against the following Individual Defendants: Detective Norton, Deputy Byron, Deputy Watkins, Deputy Slaugh, Trooper Swenson, Trooper Young, Trooper Chugg, Trooper Olsen, and DWR Officer Davis. Plaintiffs also allege civil conspiracy under both sections against Vernal City.[70]

Summed up, Plaintiffs' argument is that Defendants engaged in "[a] conspiracy to cover up a killing."[71] Plaintiffs' theory is that Detective Norton shot and killed Mr. Murray, and that the rest of the Defendants conspired to cover-up that killing and protect Detective Norton.[72]

---

[70]Plaintiffs do not allege a § 1983 conspiracy. A § 1983 conspiracy claim is "a conspiracy to violate a right protected by § 1983; in other words, a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color of state law." <u>See</u> <u>Dixon v. Lawton</u>, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990). To recover under a § 1983 conspiracy theory, a plaintiff must plead and prove (1) a conspiracy, and (2) an actual deprivation of rights, but need not prove racial animus. <u>See id.</u> at 1449; <u>see also</u> <u>Landrigan v. City of Warwick</u>, 628 F.2d 736, 742-43 (1st Cir. 1980).

[71](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 15.)

[72](<u>See</u> May 2, 2013 Status Conference Tr. (Docket No. 366) at 100.) "Our theory is that he [Norton] shot him and where and what happened from there, Your Honor, is all part of this conspiracy to cover up the fact that he shot him. . . . [W]e are alleging, Your Honor, that they conspired to cover up Norton killing this young man." (<u>Id.</u>) For Plaintiffs, "there is an issue as

40

Plaintiffs argue:

> It is clear from the totality of the circumstances that all the law enforcement officers acted in concert to ensure that Mr. Murray would not survive to tell his version of the events, that any evidence that contradicted [Detective] Norton's version of the events was destroyed . . . . In fact, Defendants went as far as to violate the law to tamper with and destroy evidence.[73]

Plaintiffs argue that Defendants' conspiratorial conduct obstructed justice in a state court proceeding in violation of § 1985(2) and deprived Mr. Murray of equal protection under the laws in violation of § 1985(3).

Each of the Individual Defendants, as well as the sole municipal defendant, Vernal City, asks the court to grant their motions for summary judgment on the ninth and tenth causes of action.

Section 1985(2) is separated into two clauses by a semicolon. The first clause addresses conspiracies to obstruct justice in federal courts, and the second clause addresses conspiracies to obstruct justice in state courts. See Kush v. Rutledge, 460 U.S. 719, 724-25 (1983). The Plaintiffs bring their § 1985(2) claim under the second clause, which is commonly referred to as the clause "after the semicolon" or "following the semicolon." See i.e., Brown v. Chaffee, 612 F.2d 497, 502 (10th Cir. 1979); see also Lessman v. McCormick, 591 F.2d 605, 607 (10th Cir. 1979). To prevail against Defendants' motions for summary judgment, Plaintiffs must show

---

to whether or not he [Mr. Murray] was murdered." (Id. at 106.) As noted above, the evidence does not and could not support a conclusion that Mr. Murray was killed by Detective Norton.

[73](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 21); (Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 19); (Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 22); (Pls.' Mem. Opp'n to Swenson's Mot. Summ. J. (Docket No. 322) at 18-19); (Pls.' Mem. Opp'n to Young's Mot. Summ. J. (Docket No. 325) at 20); (Pls.' Mem. Opp'n to Chugg, Davis, & Olsen's Mot. Summ. J. (Docket No. 326) at 18.)

there is evidence of a conspiracy, that obstructs the "due course of justice in any State," and that causes injury. See 42 U.S.C. § 1985(2). The conspiracy must have the "intent to deny to any citizen the equal protection of the laws." Id.

Section 1985(3) contains four clauses, but Plaintiffs bring their cause of action under only the first one, which also addresses conspiracy to violate equal protection of the laws. To survive Defendants' motions for summary judgment on § 1985(3), Plaintiffs must present evidence to prove a (1) conspiracy; (2) to deprive them of equal protection; (3) at least one overt act in furtherance of the conspiracy; and (4) an injury or deprivation that results. See Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993) (citing Griffin v. Breckenridge, 403 U.S. 88, 103 (1971)).

Significantly, in addition to proving a conspiracy and a violation of a civil right, both of these civil conspiracy sections (§ 1985(2) and § 1985(3)) require the Plaintiffs to show that there is race-based discriminatory animus motivating the alleged conspiracy. See Griffin, 403 U.S. at 102 (§ 1985(3) requires showing of racial or some other class-based invidious discriminatory intent); see also Smith v. Yellow Freight Sys., Inc., 536 F.2d 1320, 1323 (10th Cir. 1976) ("[A] racial, or perhaps otherwise class-based, invidiously discriminatory animus must be behind the conspirators' action for a cause of action under that portion of § 1985(2) following the semicolon."); see also Lessman v. McCormick, 591 F.2d 605, 608 (10th Cir. 1979).

**Individual Defendants**

**1.      No Evidence of Racial Animus**

In their motions for summary judgment, the Individual Defendants argue that there is no evidence that an invidious, racial-based animus against Mr. Murray motivated the alleged

conspiracy. Plaintiffs respond that "[t]he only plausible explanation for the abusive way Defendants handled every aspect of this case is racial bias."[74]

In addition to their global claim that everything that happened in this case proves their claim of racial animus, Plaintiffs offer the following evidence to support a finding of invidious racial animus: (1) Trooper Swenson announced that there were "tribal males" in the vehicle he was pursuing; (2) Detective Norton testified that he thought that Mr. Murray and Mr. Kurip were Hispanic when they first passed him on the road at a high speed; and (3) There was "significant racial tension between Utah State police officers and Native Americans in Utah."[75]

Plaintiffs assert that Trooper Swenson "was quick to announce" that the individuals in the car he was pursuing were "tribal males" for "the express purpose of communicating to all responding officers the unspoken fashion in which to respond to the incident."[76] But Trooper Swenson's "announcement" was hardly a quick one: he did not identify the possible ethnicity of the driver to central dispatch until more than ten minutes into the high speed chase. And then all

---

[74](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 20-21); (Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 17-21); (Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 21-24); (Pls.' Mem. Opp'n to Swenson's Mot. Summ. J. (Docket No. 322) at 17-21); (Pls.' Mem. Opp'n to Young's Mot. Summ. J. (Docket No. 325) at 18-22); (Pls.' Mem. Opp'n to Chugg, Davis, & Olsen's Mot. Summ. J. (Docket No. 326) at 17-20.)

[75] (See Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 22); (see also Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 18.)

[76](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 20-21); (Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 18); (Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 21-22); (Pls.' Mem. Opp'n to Swenson's Mot. Summ. J. (Docket No. 322) at 18); (Pls.' Mem. Opp'n to Young's Mot. Summ. J. (Docket No. 325) at 19); (Pls.' Mem. Opp'n to Chugg, Davis, & Olsen's Mot. Summ. J. (Docket No. 326) at 18.)

Trooper Swenson says is "Male appears to be tribal, driver."[77]  The second reference Trooper Swenson makes to central dispatch is twenty-six minutes into the chase and after Mr. Kurip crashes the car he is driving at Turkey Track and both he and Mr. Murray leave the car and run in opposite directions.  At that point, Trooper Swenson states: "I've got two runners out, both tribal males."[78]

Trooper Swenson made those statements to dispatch on his radio, and the dispatch agent copied that information on the radio channel.  The evidence before the court is clear that Detective Norton was not among those listening to the dispatch radio.[79]  Although Trooper Swenson made those statements, the record does not support an inference that all of the other Defendants heard them and acted based upon them, especially because the radio quality was questionable.

Deputy Byron testified that the quality of the radio signal and communication was quite bad:  "Handheld radios don't get out in tight areas, especially in that general area.  It's—it's broken, broken traffic.  You're only maybe catching pieces.  Sometimes it's just a radio break."[80] He testified that the connection was worse than only being able to hear every third word.[81]

---

[77](See Police Audio Dispatch Tr., Ex. 5 to Defs.' Mem. Opp'n App. (Docket No. 306-5) at 11.)

[78](See Police Audio Dispatch Tr., Ex. 5 to Defs.' Mem. Opp'n App. (Docket No. 306-5) at 25-26.)

[79]Norton Dep. 109-110.

[80]Byron Dep. 95, 97.

[81]Id.

In addition, the Individual Defendants joined the dispatch channel at different points, and the evidence before the court is that they joined the chase to provide backup support for Trooper Swenson. Regardless of when they joined the dispatch channel, the evidence before the court is that not all of them heard Trooper Swenson's descriptive statements. Officer Davis is the only defendant who testified that he heard a reference to tribal males over the radio, and he was one of the last officers to arrive at the shooting scene.[82] Deputy Watkins and Deputy Byron testified that they did not hear a reference to "tribal males."[83] Troopers Young & Olsen testified that they did not recall hearing that there were "tribal males" over the radio and that the racial identity of the car occupants was not in their minds during the chase.[84] Trooper Chugg included a reference to Swenson's identification of the car occupants as "tribal males" in his written report based on what he was displayed on his CAD screen, not what he heard over dispatch.[85]

Based on the evidence before the court, no reasonable juror could conclude that these two statements by Trooper Swenson initiated a racially-motivated conspiracy against Mr. Kurip and Mr. Murray, that led to Mr. Murray's death at the hand of Detective Norton.

Similarly, no reasonable juror could find that Detective Norton's description of the men in the car as Hispanic supports Plaintiffs' contention that Detective Norton's conduct, and the conduct of the other Individual Defendants, was motivated by racial animus against Native

---

[82]Davis Dep. 55.

[83]Watkins Dep. 78-79; Byron Dep. 84; Young Dep. 50.

[84]Young Dep. 50; Olsen Dep. 78.

[85]Chugg Dep. 108-109.

Americans.[86]  Indeed, the fact that Trooper Swenson and Detective Norton reached different conclusions about the ethnicity of men in the car suggests otherwise.

Detective Norton did not start following Trooper Swenson in the high speed chase because of Trooper Swenson's characterization of the car occupants as "tribal," nor did he continue to follow Trooper Swenson's car for that reason.  Detective Norton did not have a radio in his private car and did not hear Trooper Swenson's first comment about the driver appearing to be "tribal."  Detective Norton testified that while off-duty he observed what he believed to be a high speed chase, and that he called dispatch to determine if the chasing officer had any back up assistance.[87]  Upon learning that he was the officer closest to Trooper Swenson, Detective Norton started to follow Trooper Swenson, even though he lost sight of him quickly because of the chase speeds.[88]  No reasonable juror could conclude that Detective Norton's statement that the car occupants appeared to be Hispanic, or even his decision to follow Trooper Swenson after that, is evidence of racial animus toward Native Americans.

Finally, Plaintiffs argue that the relationship between Native Americans in Utah and Utah State police officers is rife with racial tension and animosity, and that the strained relationship between Native Americans and police officers in Utah supports a conclusion of racial animus in support of civil conspiracy in this case.  They point to the testimony of Deputy Byron and Deputy

---

[86]Detective Norton states that he thought the men were Hispanic because they were in a car with Nevada license plates.  Norton Dep. 115.

[87]See Norton Dep. 107-108, 116-118.

[88]See id. at 121.

Slaugh to support their position.[89]  But even construing that evidence most favorably for the Plaintiffs, the best that Plaintiffs could argue is that some Native Americans have negative views toward members of law enforcement, and that some members of law enforcement may have negative views toward particular Native Americans.  There is nothing that links that negativity to the events that precipitated this case.  And the testimony of Deputy Byron and Deputy Slaugh is clear that despite disagreements with individual Native Americans, or moments of frustration with Native Americans, the officers do their best to respond to such disagreements and frustrations professionally and do not use the negative experiences that they have had as a justification for misconduct.

Whether these facts are considered separately or together, no reasonable jury could find that the facts offered by the Plaintiffs amount to invidious racial animus toward Native Americans generally, or Mr. Murray in particular.  There is no other evidence in the record that makes a stronger showing.  Plaintiffs' theory is that the Defendants responded to, and participated in, the chase because, as Plaintiffs' counsel suggested, "They were hunting themselves an Indian . . . ."[90]  No reasonable jury could reach that conclusion, and neither can the court.

---

[89]See Byron Dep. 171-173; see also Slaugh Dep. 164-170. Deputy Byron was part of the Uintah County Sheriff's office, and could not have spoken to racial relations between Native Americans and "Utah state police officers" as Plaintiffs suggest. Deputy Slaugh's testimony speaks to racial tension, but at most it is tension between the Uintah County Sheriff's office, not Utah State police officers generally.

[90](See May 2, 2013 Status Conference Tr. (Docket No. 366) at 118.)

47

## 2. Conspiratorial Acts

Even if the evidence supported the necessary finding of racial animus, the Individual Defendants argue that there is no evidence of conspiracy and no evidence of overt acts in furtherance of a conspiracy. Defendants also argue that there is no state court proceeding, and therefore no obstruction of justice in that forum, necessary components for a claim under § 1985(2).

In their responses to the motions for summary judgment, Plaintiffs do not point to any direct testimonial or documentary evidence before the court to show that two or more defendants agreed to a conspiracy to violate Mr. Murray's civil rights. Instead, the Plaintiffs repeatedly ask the court to infer the existence of such a conspiracy (much like they asked the court to infer racial animus) from a handful of facts and the Plaintiffs' speculative characterization of those facts as so "brazen and flagrant" and "unjustifiable and irrational" that they support a finding of conspiracy.[91]

Plaintiffs argue that "[i]t is clear from the totality of the circumstances that all the law enforcement officers acted in concert to assure [sic] that Mr. Murray would not survive to tell his version of the events . . . ."[92] As evidence of this conspiratorial aim, the Plaintiffs argue that

---

[91](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 20-21); (Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 15, 17, 19); (Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 19, 21, 23); (Pls.' Mem. Opp'n to Swenson's Mot. Summ. J. (Docket No. 322) at 17-19, 21); (Pls.' Mem. Opp'n to Young's Mot. Summ. J. (Docket No. 325) at 18-20, 22); (Pls.' Mem. Opp'n to Chugg, Davis, & Olsen's Mot. Summ. J. (Docket No. 326) at 16-17, 19.)

[92](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 21); (Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 19); (Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 22); (Pls.' Mem. Opp'n to Swenson's Mot. Summ. J. (Docket No. 322) at 18-19); (Pls.' Mem. Opp'n to Young's Mot. Summ. J. (Docket No. 325) at

Defendants (1) failed to give Mr. Murray medical aid; (2) destroyed evidence; (3) participated in a racially-based illegal chase; (4) offered inconsistent stories; (5) participated in conversations about the events; and (6) communicated by cell phone. The focus of the Plaintiffs' conspiracy theory is the failure to give aid and their spoliation argument about the destruction of evidence. But they raise the other issues in their responses to the Defendants' motions for summary judgment, so the court addresses them.

A conspiracy "requires the combination of two or more persons acting in concert." Brever v. Rockwell Int'l Corp., 40 F.3d 1119, 1126 (10th Cir. 1994) (quoting Abercrombie v. City of Catoosa, 896 F.2d 1228, 1230 (10th Cir. 1990)). The Plaintiffs have not established direct evidence of a meeting of the minds or agreement among the Defendants.

Of course, "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire." See Snell v. Tunnell, 920 F.2d 673, 702 (10th Cir. 1990) (quoting Bell v. City of Milwaukee, 746 F.2d 1205, 1260 (7th Cir. 1984)). And sometimes the "sequence of events" in a case will create "a substantial enough possibility of a conspiracy" to allow Plaintiffs to proceed to trial. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

But for Plaintiffs to establish an agreement to conspire based on circumstantial evidence, they have to show more than that Defendants acted or didn't act. "Parallel action . . . or inaction . . . does not necessarily indicate an agreement to act in concert." Salehpoor v. Shahinpoor, 358 F.3d 782, 789 (10th Cir. 2004). There have to be real questions of fact and gaps that Defendants fail to, and cannot, explain. See Adickes, 398 U.S. at 157-59.

20); (Pls.' Mem. Opp'n to Chugg, Davis, & Olsen's Mot. Summ. J. (Docket No. 326) at 18.)

An examination of the evidence Plaintiffs rely on fails to make this showing. The court will discuss each in turn.

        a.      <u>Failure to Give Medical Aid</u>

As discussed more below, the evidence before the court shows that the Individual Defendants believed that Mr. Murray was gravely injured and that medical care was imminent because the ambulance was en route. The evidence also shows that none of the Individual Defendants provided first aid to Mr. Murray. But the Plaintiffs' conclusion, that the Individual Defendants did not provide aid to Mr. Murray because they wanted him to die so that his version of the events with Detective Norton would be lost, is too speculative based on the evidence before the court. Standing alone, the fact that none of the Defendants gave aid to Mr. Murray is not sufficient to show that the Defendants failed to act because of a common conspiratorial objective.

Discussing conspiracy actions brought under § 1983 and § 1985, the Tenth Circuit Court of Appeals stated:

> [W]e have generally held a federal conspiracy action brought under either of these statutes requires at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective. In addition, while we have said allegations of a conspiracy may form the basis of a § 1983 claim, we have also held "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants" because "[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim."

<u>Brooks v. Gaenzle</u>, 614 F.3d 1213, 1227-28 (10th Cir. 2010) (quoting <u>Tonkovich v. Kan. Bd. of Regents</u>, 159 F.3d 504, 533 (10th Cir. 1998)) (internal citations omitted). In sum, there is no evidence before the court to support a finding that the inaction by each individual defendant was

part of a conspiracy to let Mr. Murray die.

b.    Failure to Preserve Evidence

After carefully considering all of the arguments and evidence raised by the parties, as well as taking oral testimony from experts and the Defendants, the court denied the Plaintiffs' motion for sanctions based on spoliation of evidence.[93]   The court found that the Defendants were not liable for spoliation.

Based on the facts as detailed and explained in its spoliation order, the court concludes that no reasonable jury could conclude that Defendants conspired to "effectively eliminate[] all probative evidence"[94]  and "clean the closet of evidence that would have allowed Plaintiffs to build their case."[95]

c.    Participation in Racially-based Illegal Chase

While the Plaintiffs allege that Detective Norton and Trooper Swenson, as well as the other Defendants, were illegally chasing Mr. Kurip and Mr. Murray because they were Native Americans, and that the officers illegally chased them on tribal land, the evidence is clear that those two officers did not even agree about the ethnicity of Mr. Kurip and Mr. Murray.

---

[93](See March 7, 2014 Mem. Decision & Order on Spoliation (Docket No. 429).)

[94](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 17); (Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 15); (Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 19); (Pls.' Mem. Opp'n to Swenson's Mot. Summ. J. (Docket No. 322) at 16); (Pls.' Mem. Opp'n to Young's Mot. Summ. J. (Docket No. 325) at 18); (Pls.' Mem. Opp'n to Chugg, Davis, & Olsen's Mot. Summ. J. (Docket No. 326) at 16.)

[95](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 19); (Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 17); (Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 20); (Pls.' Mem. Opp'n to Swenson's Mot. Summ. J. (Docket No. 322) at 17); (Pls.' Mem. Opp'n to Young's Mot. Summ. J. (Docket No. 325) at 18); (Pls.' Mem. Opp'n to Chugg, Davis, & Olsen's Mot. Summ. J. (Docket No. 326) at 17.)

Furthermore, there is no evidence that Detective Norton communicated with the other Defendants during the high speed chase. In fact, the evidence shows that Trooper Swenson and Detective Norton did not communicate during the chase, and had only brief contact once that chase ended at Turkey Track.[96] That is not sufficient to give rise to an inference that they conspired. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1230-31 (10th Cir. 1990).

The evidence shows that the Defendants were responding to a rapidly-unfolding and unpredictable situation that involved a half-hour car chase of at least 120 miles per hour, two car crashes, and travel through more than two residential areas where there was increased risk to the public. During that time, Trooper Swenson was concerned about the safety of Mr. Kurip and Mr. Murray given the high speed of the chase.[97] No reasonable jury could conclude that the Defendants' responses to the high speed chase reflected an agreement to violate Mr. Murray's civil rights because of this race.

       d.    <u>Inconsistent Stories</u>

Plaintiffs allege that the version of events given by Deputy Byron "directly contradicts" Detective Norton's description about what happened when Mr. Murray was shot, and they argue that "Defendants have conspired to tell a common story about what happened; however, as is common with fabrications, the factual details are not congruent."[98] The Plaintiffs base these sweeping conclusions on the following: Detective Norton testified that he believed that Mr.

---

[96]See Swenson Dep. 134; see also Norton Dep. 126-28.

[97]See Swenson Dep 111-12.

[98](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 19); (Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 16-17); (Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 20.)

Murray paused in the moment before he shot himself, but Deputy Byron testified that he saw Mr. Murray walking, heard the shots, noticed that Detective Norton was no longer on the top of the hill, and then saw Mr. Murray drop.[99] Deputy Byron's testimony is silent about what Mr. Murray was doing in the seconds before he dropped. As both officers were making their way through rough terrain, it is unlikely that both officers had their eyes on Mr. Murray at every second. Detective Norton testified he was scrambling up the rocky hillside while trying to make a call on his cell phone and keep his gun pointed at Murray. Deputy Byron testified that he and Trooper Young were making their way through some "pretty rough country."[100] This evidence does not establish a conspiracy or even that Detective Norton's story is necessarily inconsistent with Deputy Byron's.

e. Delayed Ambulance Arrival

Plaintiffs also allege that Deputy Watkins and Deputy Slaugh conspired to "ensure that Murray would not live to tell his version of what happened" by slowing down the ambulance that was en route to the scene and by directing the ambulance to an "impassable" ridge so that it would take longer to reach Mr. Murray.[101] There is simply no evidence before the court to support this argument.

---

[99]Byron Dep. 96-97.

[100]Byron Dep. 97.

[101](Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 17.)

f.     Participated in Conversations about Events

Plaintiffs point to the fact that officers Chugg, Davis, and Olsen spoke to each other about the events that took place on April 1, 2007.[102]  They cite to <u>Krilich v. Village of South Holland</u>, 1994 WL 457227 (N.D. Ill. 1994), for the proposition that conspiracy can be inferred, simply, from evidence of a conversation between defendants.  While there are several distinctions that can be made between this case and <u>Krilich</u> on the facts, the one that matters is that the alleged conversations that took place in <u>Krilich</u> occurred before the alleged constitutional violations.  And, based on the evidence before the <u>Krilich</u> court, there was a genuine issue of material fact about whether the officers discussed the plaintiff before arresting him in violation of his constitutional rights.  <u>See</u> <u>id.</u> at *3.

Here, there is no evidence before the court that the conversations cited by the Plaintiffs[103] were about Mr. Murray and a plan to withhold medical aid and destroy evidence.  The only conversations cited by the Plaintiffs were conversations between officers Davis, Chugg, Olsen, and Swenson.  And Trooper Swenson was not implicated in the failure to give aid or preserve evidence related to Mr. Murray's death.

The testimony offered by the Plaintiffs about the conversations that occurred on April 1, 2007, the date of the alleged constitutional violations, can be summarized as follows:  Officer Davis testified that he spoke with Trooper Swenson when he arrived at the Turkey Track crash site, and that Trooper Swenson directed him to the oil location road.  Trooper Chugg testified that he spoke with Trooper Swenson at the crash site and they discussed the high speed chase.

---

[102](Pls.' Mem. Opp'n to Chugg, Davis, & Olsen's Mot. Summ. J. (Docket No. 326) at 16.)

[103]Davis Dep. 26; Chugg Dep. 42-43, 78, 82-83, 85; Olsen Dep. 114-15.

54

Trooper Chugg could not remember any details about what Trooper Young told him when he arrived at the shooting scene and he testified that he never spoke with Deputy Slaugh at the scene or after. Trooper Chugg also testified that he did not recall any conversations with Officer Davis at the scene or after.

After April 1, 2007, Plaintiffs cite to testimony showing that Officer Davis had a conversation with Trooper Olsen about this lawsuit, that Trooper Chugg spoke with Trooper Swenson to discuss the criminal charges that were brought against Mr. Kurip, and that Trooper Olsen testified that he interviewed Trooper Swenson about the chase and the instant litigation. No reasonable jury could find that those conversations are evidence of a conspiracy to deprive Mr. Murray of medical aid or access to state court.

Significantly, most of the conversations identified by the Plaintiffs took place <u>after</u> the alleged constitutional violations at the heart of Plaintiffs' theory about the conspiracy. If the court were to take the conversations as circumstantial evidence of a conspiracy, namely to withhold medical aid and destroy evidence, the conversations would have had to occur before the failure to give aid and preserve evidence.

### g. Cell Phone Communication

Finally, in their response to Trooper Swenson's motion for summary judgment, the Plaintiffs argue that the officers "switched from their police radios to their cell phones so that their communications after the shooting would not be recorded and preserved."[104] They do not indicate in their response which Defendants used their cell phones or how that use linked them to the conspiracy. The fact that the officers used cell phones to communicate once they were out of

---

[104](Pls.' Mem. Opp'n to Swenson's Mot. Summ. J. (Docket No. 322) at 15.)

their vehicles and out of range of their radios does not amount to circumstantial evidence of a conspiracy. Moreover, the evidence is clear that Detective Norton used his cell phone because he was in his private car and did not have a dispatch radio with him.

As noted above, the record reflects that the radio signal in the remote area where the events unfolded was poor and made communication over the dispatch radio difficult. Words were dropped. Phrases were lost. There is no evidence to support Plaintiffs' purely speculative conclusion. The only evidence before the court is the difficulty of communicating by radio and the improved communication with cell phones.

In sum, the Plaintiffs have not established the existence of a conspiracy, which is a prerequisite to a claim under § 1985(2) and § 1985(3). Accordingly, the Individual Defendants and Vernal City are entitled to summary judgment on the ninth and tenth causes of action.

### 3.     Failure to give Medical Aid

In their summary judgment motions, the Defendants argue that there were no violations of Mr. Murray's civil rights. They also argue that even if there were violations of Mr. Murray's civil rights, they were entitled to qualified immunity for any such acts.

Plaintiffs originally argued there were numerous civil rights violations at the center of the alleged conspiracies. But at this stage in the litigation, Plaintiffs focus on two issues for all of the Individual Defendants: (1) failure to give medical aid to Mr. Murray, and (2) interference with Mr. Murray's due process right of access to courts via the failure to preserve critical evidence and the affirmative destruction of critical evidence. Plaintiffs argue that the evidence surrounding these two allegations require the court to infer not only the existence of a conspiracy (an agreement to conspire and overt acts in furtherance of the conspiracy), but also the substantive

56

conclusions that Mr. Murray's civil rights were violated by the failure to give aid and that the spoliation of evidence prevented him from seeking redress in state court.

In their complaint, Plaintiffs allege a number of § 1983 violations and then use those alleged violations as examples of overt acts in furtherance of the alleged § 1985 conspiracy causes of action. But Plaintiffs do not plead the failure to give medical aid in this way. That alleged civil rights violation is something that the Plaintiffs only allege as part of their § 1985(2) and § 1985(3) conspiracy claims and not as a stand-alone violation under § 1983. When asked about this apparent discrepancy, Plaintiffs' counsel responded that the failure to give medical aid was included in the failure to intervene section of the complaint, which is the fifth cause of action, but deferred argument on this to her co-counsel.[105] Co-counsel argued that paragraph 108 of the fifth cause of action, which addresses unlawful use of excessive and deadly force, encompassed the failure to give aid because of its reference to substantive due process. Paragraph 108 is not about failure to give aid. Plaintiffs did not offer a convincing explanation about how failure to give aid was included in their failure to intervene cause of action. But because the Defendants address the failure to give aid argument in their motions for summary judgment, the court will address it on the merits.

Plaintiffs make no distinction among the Defendants named in the ninth and tenth causes in terms of the alleged failure to give medical aid. Instead, they lump all of "the Defendants" together. In doing so, they fail to identify the action taken (or not taken) by specific Defendants.

Not all of the named Individual Defendants were in a position to give medical aid to Mr. Murray. Lieutenant Chugg, for example, arrived at the scene after the ambulance had already left

---

[105](See May 2, 2013 Status Conference Tr. (Docket No. 366) at 113.)

with Mr. Murray.  Troopers Olsen and Swenson never went to the shooting scene at all.  The court only considers this alleged violation against officers Norton, Byron, Young, Davis, Watkins, and Slaugh.

By 11:22 a.m., there were two ambulances on stand-by because of the high speed chase.[106]  By 11:31 a.m., just before Detective Norton called central dispatch about the exchange of fire and to report that Mr. Murray shot himself in the head, both ambulances were already on their way to Turkey Track because of the crash at the end of the chase.[107]  By 11:41 a.m., Deputy Byron and Trooper Young had reached Mr. Murray's body, and Deputy Byron had rolled Mr. Murray onto his side and placed him in handcuffs.  Trooper Young asked central dispatch to advise the ambulance that Mr. Murray was unconscious and had labored breathing.[108]  At 12:01 p.m., according to the dispatch clock, the ambulance was reportedly a few minutes away.[109]  The Gold Cross Ambulance assessment form indicates that the emergency medical technicians had contact with Mr. Murray at 12:02 p.m., that he was unconscious, that his breathing was still labored, and that his pupils were fixed and dilated.[110]

Once Deputy Byron handcuffed him, Mr. Murray was under the care and control of the officers at the scene of the shooting and had to rely upon them to provide medical care, even

---

[106](See Police Audio Dispatch Tr., Ex. 5 to Defs.' Mem. Opp'n App. (Docket No. 306-5) at 22-23.)

[107](See Police Audio Dispatch Tr., Ex. 5 to Defs.' Mem. Opp'n App. (Docket No. 306-5) at 30-31.)

[108](See id. at 40.)

[109](See id. at 45-46.)

[110](See Ambulance Report, Ex. W to Pls.' Mot. Default J. (Docket No. 258-24) at 2.)

though his injury was self-inflicted. The officers were obligated to provide that medical care to him. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." See DeShaney v. Winnebago County. Dept. of Social Servs., 489 U.S. 189, 199-200 (1989); see also Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) (Due Process Clause requires state actors to provide medical care to suspects in police custody); see also Estelle v. Gamble, 429 U.S. 97, 103 (1976) (the Eighth Amendment requires officials to provide medical care to prisoners).

Summoning an ambulance and making sure that the injured suspect is "taken promptly to a hospital" is constitutionally required. See Revere, 463 U.S. at 245. Defendants argue that once they called for an ambulance and EMTs to provide medical care to Mr. Murray, they had discharged their constitutional obligations. The evidence before the court is clear that an ambulance was en route when Mr. Murray shot himself, that the ambulance personnel were told that there was someone with a gunshot wound and labored breathing, and that, when the ambulance arrived, emergency medical technicians provided Mr. Murray with medical care and took him to the hospital.

But Plaintiffs argue that the failure to try and stop bleeding from the entry and exit wounds in his skull, as well the failure to provide cardiopulmonary resuscitation, amounted to a civil rights violation.

The Tenth Circuit, following the Ninth Circuit, has refused to find that the due process clause establishes an affirmative duty on police officers to provide medical care—even something as basic as CPR—in any and all circumstances. "[T]here is no duty to give, as well as

59

summon, medical assistance, even if the police officers are trained in CPR." See Wilson v. Meeks, 52 F.3d 1547, 1555 (10th Cir. 1995); see also Maddox v. City of Los Angeles, 792 F.2d 1408, 1411, 1415 (9th Cir. 1986). The Wilson court made a distinction between the provision of "medical care" that only "highly trained personnel" can provide and "first aid" that "anyone" can provide. See Wilson, 52 F.3d at 1555-56.

While it is true that "anyone can render first aid," the nature of any given injury faced by police officers in a rapidly unfolding and dynamic situation may dictate whether providing first aid is actually a good idea. Indeed, there may be medical disagreement about how best to proceed. See id. at 1555-56. First aid is often viewed as a "limited intervention with the immediate goal of preventing death," but even attending to an injured person's airway, breathing, and circulation "ABC" could be problematic depending on the nature of the injury. Id. at 1556. In Wilson, for example, there was disagreement about whether breathing is best facilitated by lying on one's side or one's back. Id. To legally require police officers to provide first aid, or to take specific action, in every situation (and to hold them legally responsible for civil rights violations when they fail to do so) is, in the words of the Tenth Circuit, "unfair and unwise." Id.

But under the Eighth Amendment and the Due Process Clause, delay in medical care can be a constitutional violation when that delay results in "substantial harm" and when the government actor was "deliberately indifferent" to the risk of that harm. See Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000) (citing Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993)); see also Howard v. Dickerson, 34 F.3d 978, 980-81 (10th Cir. 1994) (Eighth Amendment standard of deliberate indifference applies in the context of due process analysis).

Considered from this perspective, the question is whether, based on the evidence before the court, a reasonable jury could find that the officers were "deliberately indifferent" to Mr. Murray's medical needs because they did not perform CPR or try to staunch the flow of blood from Mr. Murray's head. That question has objective and subjective elements: (1) whether the need for medical care was sufficiently serious; and (2) whether the Defendants acted with sufficient culpability in failing to render that care. See Oxedine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001) (quoting Perkins v. Kan. Dept. of Corr., 165 F.3d 803, 809 (10th Cir. 1999)). A medical need or injury is considered "sufficiently serious" when a physician determines that it requires treatment or when it is "so obvious" that even a lay person could recognize the need for medical attention. Sealock, 218 F.3d at 1209 (quoting Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999)). There is no question that Mr. Murray's head wound met the threshold question of being "sufficiently serious."

An analysis of the subjective element of deliberate indifference requires the court to determine whether the Defendants knew that Mr. Murray faced "a substantial risk of harm" if they didn't stop the blood flow and attempt CPR and whether the Defendants nevertheless disregarded that risk of harm with deliberate indifference by failing to take "reasonable measures" to abate it. See Oxedine, 241 F.3d at 1276. Would trying to stop the blood flow from the bullet holes and attempting CPR have been "reasonable measures" given Mr. Murray's injuries and condition? Based on the evidence before it, the court finds that no reasonable jury could conclude that the Defendants' failure to try and stop Mr. Murray's bleeding while they waited for the ambulance to arrive resulted in "substantial harm" to Mr. Murray, and that Defendants nevertheless disregarded the risk of that harm.

61

Plaintiffs' theory is that the Defendants acted "in concert to assure that Mr. Murray would not survive,"[111] and that if Defendants had provided medical aid to Mr. Murray while waiting for the ambulance to arrive, he "might have survived to give his own account of the encounter" with Detective Norton and the other Defendants.[112]

That Mr. Murray "might" have survived had he received medical aid before the ambulance arrived is all that the Plaintiffs can argue because there is no evidence before the court that Mr. Murray could have or would have survived his self-inflicted head wound, even if the Defendants had attempted to give first aid to Mr. Murray. There is no evidence before the court that Defendants could have stopped Mr. Murray's bleeding if they had tried, or that he would have survived had the bleeding stopped.

What is before the court is the testimony of physician Dr. Edward Leis, who is the Chief of the Utah State Office of the Medical Examiner. Dr. Leis testified that Mr. Murray's head wound was a fatal one, that the pathway of the bullet, the location of the entrance and exit wounds, and the trauma to the brain tissue were not survivable.[113] Even if the bleeding had been stopped, Dr. Leis testified that Mr. Murray would have died from the brain swelling as a result of the bullet trauma.[114] Based on those facts, no reasonable jury could find that first aid given by Individual Defendants while they waited for the ambulance to arrive could have saved Mr.

---

[111](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 21.)

[112](Id. at 17.)

[113](June 6, 2013 Evidentiary Hr'g Tr. (Docket No. 421) at 71-73.)

[114](Id. at 71-72.)

Murray, or that Mr. Murray's death was caused by the Individual Defendants' failure to provide that aid as the Plaintiffs suggest.

The report of Plaintiffs' criminal justice expert William T. Gaut, Ph.D., who is not a medical doctor, does not create a question of material fact on these issues. Dr. Gaut concedes that gunshot wounds to the head are "usually fatal."[115] While he also suggests that "many victims of gunshot injuries to the head survive,"[116] there is no evidence before the court that Mr. Murray would have been or could have been one of those survivors.

Officers Norton, Byron, Young, Davis, Slaugh, and Watkins all testified that they did not take any steps to stop the bleeding from Mr. Murray's head. They offered a variety of reasons for not trying to stop Mr. Murray's bleeding. Some stated that they did not help because they did not believe that there was anything they could do to help him and that, given the severity of the wounds, there was no way to stop the bleeding.[117] Some stated that they did not have the expertise to deal with traumatic head injuries and were afraid of doing more harm than good, especially since the ambulance was en route.[118] And Deputy Watkins added that while the Uintah

---

[115](See Gaut Report, Ex. I to Pls.' Mot. Default J. (Docket No. 258-10) at 14.)

[116](Id.)

[117]See Young Dep. 132; Slaugh Dep. 135; Watkins Dep. 102-03. Byron testified that he had basic first aid training about how to "patch" someone and that while he carried a "basic first aid kit" in his car, it was "small." Byron Dep. 136. Watkins also references his "basic" first aid kit and implies that not only did he not have it on him, but also that it was not adequate for the job. Watkins Dep. 104.

[118]Norton Dep. 164; Byron Dep. 136; Davis Dep. 142; Slaugh Dep. 135.

County Sheriff Department protocol and procedure required officers to get medical aid to the scene as quickly as possible, there was nothing that required officers to administer aid.[119]

None of that testimony could allow a reasonable jury to conclude that Individual Defendants were deliberately indifferent to Mr. Murray's situation, or that they knew that there was a substantial risk of significant harm to Mr. Murray if they did not provide first aid. If anything, the evidence shows that at least three of the Individual Defendants (Young, Davis, and Slaugh) were concerned that attempts to provide any kind of aid to Mr. Murray would do more harm than good.[120]

### 4. Obstruction of Court Access and Failure to Preserve Critical Evidence

The court has discussed the Plaintiffs' claim that the Defendants failed to preserve evidence in its spoliation order and will not repeat it here.

The Plaintiffs' argument under § 1985(2) is that they have been denied judicial redress in state court because of the Defendants' conspiratorial actions of tampering with, and destroying, evidence and letting Mr. Murray die.[121] In some of their responses, the Plaintiffs argue that if

---

[119]Watkins Dep. 102.

[120]See Young Dep. 132; see Davis Dep. 109, 142; see Slaugh Dep. 135.

[121](Pls.' Mem. Opp'n to Norton's Mot. Summ. J. (Docket No. 321) at 15-16); (Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 12-13); (Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 14-15); (Pls.' Mem. Opp'n to Swenson's Mot. Summ. J. (Docket No. 322) at 14-15); (Pls.' Mem. Opp'n to Young's Mot. Summ. J. (Docket No. 325) at 15-16); (Pls.' Mem. Opp'n to Chugg, Davis, & Olsen's Mot. Summ. J. (Docket No. 326) at 13-14.)

their federal claims were dismissed, they could be remanded back to state court but because of Defendants' conduct, they would be prohibited from effectively litigating Mr. Murray's rights.[122]

There is no question that Plaintiffs have the due process right to have their legitimate claims of civil rights violations heard in court. Indeed, this court is carefully considering all of the Plaintiffs' claims. But no reasonable jury could find that the Plaintiffs have been denied their right to litigation in state court because of the Defendants' alleged conspiratorial conduct. As the court found above, as well as in its spoliation order,[123] the Defendants did not violate Mr. Murray's civil rights for failing to provide medical aid, nor did the Defendants fail to preserve evidence. Plaintiffs are in federal court instead of state court not because of the Defendants' failures on April 1, 2007, and during the ensuing investigation, but because the Plaintiffs chose to raise federal questions in their complaint, federal questions that allowed the Defendants to remove the case to federal court.

### Municipal Defendant

The only municipal defendant named in the ninth and tenth causes of action is Vernal City. In its motion for summary judgment, Vernal City argues that there is no respondeat superior liability if the respective officers have not committed a civil rights violation.

---

[122](Pls.' Mem. Opp'n to Byron's Mot. Summ. J. (Docket No. 324) at 13); (Pls.' Mem. Opp'n to Slaugh & Watkins' Mot. Summ. J. (Docket No. 327) at 15); (Pls.' Mem. Opp'n to Chugg, Davis, & Olsen's Mot. Summ. J. (Docket No. 326) at 14-15.)

[123](See March 7, 2014 Mem. Decision & Order on Spoliation (Docket No. 429).)

Detective Norton is the only Individual Defendant who worked for Vernal City.  The court has found that he is not liable for conspiracy under either § 1985(2) or § 1985(3).  Accordingly, Vernal City does not have any liability.

**D.**     **Non-Conspiracy Claims Against the Municipalities**[124]

The Plaintiffs have named two municipalities—the City of Vernal and Uintah County—in their § 1983 claims for failing to train, supervise, and implement policies that would ensure that their officers (1) did not exceed the municipalities' jurisdictional authority, (2) had probable cause to arrest, and (3) did not use excessive force.  "A plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation."  Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998) (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978)).  The Plaintiffs must also demonstrate that the municipality's action amounted to "deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton v. Harris, 489 U.S. 378, 388 (1989) (emphasis added), quoted in Myers, 151 F.3d at 1318; see also Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997) ("As our § 1983 municipal liability jurisprudence illustrates, . . . a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct

_____

[124]The City of Vernal is also named in the Plaintiffs' conspiracy claims, but analysis of Vernal City's role, if any, in a conspiracy, is contained in the portion of this order discussing the conspiracy claims.

causal link between the municipal action and the deprivation of federal rights.") (emphasis added).

Because the court has found that only one constitutional violation occurred (the handcuffing of Mr. Murray by Deputy Byron on the Reservation), only Uintah County, as Deputy Byron's employer, faces potential liability under § 1983. The City of Vernal is not liable, because "[w]hen there is no underlying constitutional violation by a [municipality] officer, there cannot be an action for failing to train or supervise the officer." Apodaca v. Rio Arriba County Sheriff's Dep't, 905 F.2d 1445, 1447-48 (10th Cir. 1990) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)); see also Taylor v. Meacham, 82 F.3d 1556, 1564 (10th Cir. 1996) ("[O]nce we conclude that the employee . . . committed no constitutional violation, the claim against the supervisory authority . . . is properly dismissed.").[125]

Uintah County asserts that even if Deputy Byron's handcuffing of Mr. Murray on Reservation land was a constitutional violation, Deputy Byron did not know, nor could he have known, that Mr. Murray was an enrolled member of the Tribe, and so there is no evidence of a causal link to any failure to train, supervise, or implement proper policies concerning officers' jurisdiction. While it is true that Deputy Byron could not have known Mr. Murray's legal status before the seizure occurred, that fact is irrelevant to the issue of whether the County is liable. Rather, the court must focus on two related issues. First, the court must determine whether the County failed to train or supervise Deputy Byron concerning his authority to exercise law

---

[125]For the same reason, the court need not address the Plaintiffs' claims of municipal liability against Uintah County for probable cause or excessive force violations, because no Uintah County officer committed any such violation.

67

enforcement duties on the Reservation.  Second, the court must determine whether the County caused Deputy Byron to act first and ask questions later.  If the answer to either question is yes (i.e., if the court finds a causal link), the court must then determine whether the County's action (or failure to act) was deliberately indifferent to the constitutional rights of others.

There is no question that Uintah County instructed its officers on the facts and issues underlying the County's jurisdiction (or lack thereof) on the Reservation.  For example, the Uintah County Sheriff's Office gave its officers maps and GPS devices so they could determine where they had jurisdiction.  The record does not support a finding of liability for failure to train or supervise.

But the record does show that the County had a potentially problematic practice of responding to all emergency calls on the Reservation when the suspect's tribal status was not known.  The officers were taught to apprehend an individual first and then determine who had jurisdiction over that person.  Certainly this practice was a moving force behind Deputy Byron's (and the others') pursuit of Mr. Murray and the subsequent handcuffing.  But the practice was not deliberately indifferent.

Plaintiffs contend that the practice was clearly in violation of the rule set forth in Ross v. Neff, 905 F.2d 1349 (10th Cir. 1990), but Ross did not provide guidance in this situation.  There, the Tenth Circuit clarified that the arrest of an enrolled member of the Tribe on Reservation land by a municipal law enforcement officer was a constitutional violation of the tribal member's Fourth Amendment rights.   Id. at 1354 (a "warrantless arrest executed outside of the arresting officer's jurisdiction [that is, on tribal land] is analogous to a warrantless arrest without probable

cause" and is "presumptively unreasonable."). <u>Ross</u> did not address an emergency situation such as the one at issue here (a high speed chase, unknown fleeing suspects, and gun shots) in which the officers had no way of determining the legal status of the fleeing suspect or the land before responding to the emergency call.

Also, the failure to implement such a practice would arguably result in the County's and officers' dereliction of their duties to enforce the law. In other words, the alternative practice suggested by the Plaintiffs—that the officers should not have pursued Mr. Murray run because he appeared to be a tribal member—would have resulted in letting Mr. Kurip, who was <u>not</u> a "tribal male" and so was subject to the County's jurisdiction, flee without pursuit. The County's practice avoided that unwanted result and was an attempt to protect members of the public.

In the absence of any clear legal guidance cited by the Plaintiffs, and given the motivation behind the practice, the County's choice to implement such a practice was not deliberately indifferent to others' rights. Accordingly, Uintah County is not liable under 42 U.S.C. § 1983.

## E.    <u>State Law Claims</u>

The Plaintiffs have alleged two state law claims against Detective Norton: (1) Assault and Battery and (2) Wrongful Death. Because the court has original jurisdiction over the Plaintiffs' federal law claims, the court automatically has supplemental jurisdiction over those two related state law claims because they form part of the same case or controversy. 28 U.S.C. § 1367(a). Because the court is now dismissing all of the claims over which it has original jurisdiction, the court declines to exercise supplemental jurisdiction over the Assault/Battery and Wrongful Death claims. <u>See</u> 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental

69

jurisdiction over a claim under [§ 1367(a)] if . . . the district court has dismissed all claims over which it has original jurisdiction[.]").  Accordingly, the Plaintiffs' claims against Detective Norton for Assault/Battery and Wrongful Death are dismissed.

## IV.  <u>ORDER</u>

For the foregoing reasons, the court ORDERS as follows:

1.      Vernal City Detective Vance Norton's Motion for Summary Judgment (Docket No. 270) is GRANTED.

2.      Uintah County Deputy Anthoney Byron Motion for Summary Judgment (Docket No. 269) is GRANTED.

3.      Uintah County Deputies Bevan Watkins' and Troy Slaugh's Joint Motion for Summary Judgment (Docket No. 266) is GRANTED.

4.      Uintah County and Vernal City's Joint Motion for Summary Judgment (Docket No. 271) is GRANTED.

5.      State Trooper Craig Young's Motion for Summary Judgment (Docket No. 275) is GRANTED.

6.      State Trooper Dave Swenson's Motion for Summary Judgment (Docket No. 276) is GRANTED.

7.      State Trooper Jeff Chugg, State Trooper Rex Olsen, and DWR Officer Sean Davis's Joint Motion for Summary Judgment (Docket No. 277) is GRANTED.

8.      Plaintiffs' motion for partial summary judgment on the First, Third, and Fifth Causes of action (Docket No. 273) is DENIED.

9.      Plaintiffs' Motion to Determine Daubert Issues and Request for Hearing to Exclude the Expert Testimony of Nicholas Roberts (Docket No. 260) is DENIED AS MOOT.

10.     Plaintiffs' Motion to Determine Daubert Issues and Request for Hearing to Exclude the Expert Testimony of Rudi Riet (Docket No. 261) is DENIED AS MOOT.

11.     Plaintiffs' Motion for Summary Judgment re: Indian Country Status of Lands (Docket No. 263) is DENIED AS MOOT.

12.     Defendants' Motions to Strike (Docket Nos. 314 and 315) the Plaintiffs' Motion for Summary Judgment re: Indian Country Status of Lands are DENIED AS MOOT.

13.     Plaintiffs' Motion to Supplement the Record (Docket No. 407) and Plaintiffs' Amended Motion for Record Supplementation (Docket No. 408) are GRANTED IN PART AND DENIED IN PART.

DATED this 7th day of March, 2014.


                              BY THE COURT:

                              *Tena Campbell*

                              TENA CAMPBELL
                              U.S. District Court Judge